617 A.2d 725

**COMMONWEALTH of Pennsylvania**

v.

**Paul M. KACSMAR, Appellant.**

Superior Court of Pennsylvania.

Submitted July 27, 1992.

Filed Nov. 4, 1992.

Reargument Denied Dec. 18, 1992.

Stanton D. Levenson, Pittsburgh, for appellant.

Sandra Preuhs, Asst. Dist. Atty., Pittsburgh, for Com., appellee.

Before DEL SOLE, KELLY and HESTER, JJ.

OPINION PER CURIAM:

Paul M. Kacsmar appeals the judgment of sentence of five to ten years imprisonment imposed following his conviction by a jury of voluntary manslaughter. As we conclude that the trial court improperly precluded appellant from introducing exculpatory evidence on the battered person syndrome, we are constrained to reverse and remand for a new trial.

Appellant was arrested on February 20, 1989, for the shooting death of his brother, Francis. Trial commenced on June 24, 1991, wherein appellant alleged he acted in self-defense. Appellant admitted that he shot his brother five times but contended that he was in fear of death or serious bodily injury as the result of Francis's actions on the night of shooting and the fact that Francis continually abused him psychologically and physically for an extended period of time prior to this event.

The evidence at trial was as follows. Munhall Police Officers Donald Beseny and Richard Facchiano responded to a police call placed at approximately 7:15 p.m. on February 20, 1989, and proceeded to appellant's residence at 3735 Botsford Street, Munhall. They arrived within approximately one minute of the call. Appellant was standing outside the residence. The officers approached him and asked if the shooting was accidental. Appellant responded, "No; I shot him. The weapon is in the kitchen on the table unloaded and he is in the living room." Notes of Testimony, 6/24–25/91, at 71. The officers entered the house and observed Mrs. Kacsmar on the sofa and Francis laying on the floor "bent over backwards with bullet holes in the chest." *Id.* They did not discover a weapon near the body.

The officers returned to appellant and escorted him into the kitchen, where Officer Facchiano asked him about an injury that he saw on appellant's mouth, which was swollen and bloody. Appellant stated, "I got punched in the mouth and I'm tired of getting beat up." *Id.* at 72. The weapon used in the shooting was a semi-automatic assault rifle. The coroner testified that the victim had five bullet wounds, bruised knuckles, and a small cut on his lip, which had been inflicted anywhere from an hour to a day prior to his death. Francis was 5'11", weighed 255 pounds, and described by the coroner as "well-developed and obese." *Id.* at 90.

Appellant testified that at the time of the shooting, he lived with his seventy-five-year-old mother and Francis on Botsford Street, where he was raised. He left his home in 1969 following his graduation from Duquesne University, where he

obtained a degree in chemistry. Immediately following college, he was employed by the National Institute of Mental Health for fourteen months and then by the Environmental Protection Agency. He was there for two years and then accepted employment with the State of Delaware as a chemist. He worked for Delaware for four and one-half years. In July, 1976, he returned to Pittsburgh. A year later, he obtained employment in private industry and worked at three different establishments over the next two years. He eventually obtained employment with the Mine Safety and Health Administration, part of the United States Department of Labor in Oakland. In 1985, he suffered a stroke and retired.

From 1976 to 1989, he lived at home with his mother and Francis. Appellant described his relationship with Francis as "typical" until 1968, when their father died, *id.* at 114, and Francis decided to take his place as head of the household. Francis had graduated from Duquesne University in 1964. He served with the army in Vietnam for four and one-half years, achieving the rank of captain upon his discharge. Appellant stated that he did not react well to Francis's new self-imposed role since appellant was twenty-one and "didn't think I needed a father at that time. . . . Plus, I didn't think he was the man to step into our father's shoes quite like that." *Id.* at 115.

Francis treated appellant "in a condescending, often critical manner. Very judgmental. He seemed to think that I owed him some sort of obedience, which I would normally give to a proper parent." *Id.* The fact that appellant failed to be obedient led to disagreements, tension, and physical altercations. During one incident that occurred in 1976, Francis slapped appellant. Since this incident occurred prior to appellant's stroke, appellant retaliated, and the two struggled temporarily.

After 1976, there were other incidents of physical violence, which appellant described as follows:

> Usually they were limited to pushing each other around a little bit and him doing a lot of threatening. There were times when we traded blows a few times.

Q  Were you ever the initiator of any of these physical incidents?

A  No.

Q  You said that he would threaten you.

A  Yes.

Q  What form would the threats take?

A  He would say things like, "I'm going to beat the hell out of you. You ought to have the hell beat out of you," or "I'm going to kill you," things like that.

Q  Were you fearful of your brother?

A  Yes.

Q  Why?

A  Because he was bigger and stronger than I was.

Q  Did he have any special training in terms of physical—

A  Yes. He was interested in martial arts. He had a brown belt in judo from some local trainer. A few times he was [not] adverse to trying a little bit of this stuff on me. I really didn't know anything about that sort of thing. I was at a disadvantage.

*Id.* at 117–18.

Appellant then described the events surrounding the shooting. Francis and he just had returned home with their mother, who had been hospitalized after suffering a heart attack in January, 1989. Appellant was watching a television program when Francis came and changed the channel. Appellant asked him if he could tape a program later. Francis agreed condescendingly, which annoyed appellant since he owned the television and VCR.

Francis stated that the two of them had to talk, which appellant had tried to avoid since the preceding November, when they had argued. Francis accused appellant of not doing his share of the housework, which surprised appellant since he had been doing most of the yard and housework since he retired. The argument escalated. Appellant testified,

I said, "What are you talking about?" He told me—I said, "What do you mean I'm not pulling my weight?" He said, "You're going to have to do more around here than

just doing the laundry, washing the dishes." I'm not sure what he meant by that. He said, "If you don't do that, I'm going to throw you out of the house."

Q What was your response to that, Paul?

A My response to that was—pardon my saying—"you're full of s——. This is not your house to throw anybody out of. It is our mother's house."

. . . .

A My mother had always led us to understand that the house—we were free to live in the house as long as she was alive; that it was our house as well as hers.

Q You said that to your brother?

A Yes.

Q What was his response?

A He said, "Well, it is not her house anymore; it is my house." I said, "What are you talking about?" He said, "Well, she sold the house to me."

Well, knowing my brother as I did, he would often exaggerate or lie if he felt it was in his interest. I thought that that is what he was doing this time; lying. I said, "You're lying again and I'm getting sick of it. I want you to knock it off." At that time, he just hauled off and punched me in the face.

Q You say he hauled off and punched you in your face?

A Yes.

Q How many times?

A Well, he punched me once, twice, three times. Then he got his hand up and gave me three sharp chop blows like that (indicating) in the jaw. I remember those very distinctly. He hit me with a couple single wallops again and a couple more pops. There were at least three instances where he hit me with the short jabs like that.

Q Were all of these to the face area?

A Yes. All to my left jaw.

Q Did you make any attempt to fend this off?

A Well, the first time I was kind of surprised. I kind of took a step back, and he advanced up and hit me again.

After about the third one, I took a swing back and I missed.

Q  You did swing back at him and you missed?

A  Yes.

Q  Then what happened?

A  He grabbed my glasses and took them off and threw them on one of the tables in the living room there.  Then he reached down and grabbed my—I was wearing a sweater.  He grabbed me by the lapel here with his left arm, left hand, and he just—because he had longer arms, he just punched away at me.

Q  Where was he punching away at you?

A  On the side of my face and jaw here.  Even after two years I would still say there is a sore area here in my cheekbone.

Q  At this point were you able to retaliate in any way?

A  No.

Q  Did you feel any blood?

A  Well, after awhile I felt something moist up here on my lip, and I put my hand up like this and looked down at it and there was blood there.  It was my blood.

My brother saw this at the same time.  He kind of stopped a second and looked at the blood there and there and said, "Oh, you're bleeding.  I will give you some more."  He started punching on me· again.

Q  Where was he punching you at that time?

A  On the face.

Q  What happened?

A  I kept stepping back, and finally I stepped back—he had a bunch of cookbooks sitting on a little TV stand.  I backed into that and knocked that over.  Somewhere about then he gave me a good wallop on the side of the face that I actually went black, my vision went black.  I felt my knees start to buckle.  I thought I was going to go down right then.  Somehow I managed to stay on my feet.

Q  So you did not go down?

A  No.

Q  What happened after that?

A  After I knocked down the TV stand, he stopped. At that point I decided to get away from him as fast as I could. I grabbed my glasses and went up to my room.

*Id.* at 122–25. Appellant testified that he was afraid for his life "[b]ecause of my brother's vicious attack on me. When everything went black there for a second, I was afraid he would injure something in my head again. That is where I had my stroke." *Id.* at 126. Feeling that the argument was not concluded, appellant decided to return "on equal terms." *Id.* at 127. Appellant rationalized his decision to confront Francis again as follows:

Q  When you say the argument was not over—you had gotten away from your brother and gone up to your bedroom; is that right?

A  Yes.

Q  Why in your mind was the argument not yet completed?

A  As far as I could see, this was establishing a pattern that was kind of stretched out. One time he slapped me over the face and that was fine. Now he finds out he can beat me up if he wants to. What was going to happen the next time? Was he going to kill me the next time? Berate me until I died? Was he going to miscalculate and maybe beat me up a little bit and cause a massive brain hemorrhage and if not kill me at least kill—certainly incapacitate me for—forever. It was a very dangerous precedent being set there.

Q  Were you fearful of your brother?

A  Yes.

Q  You said you wanted to equalize things. How did you intend to do that?

A  I decided to use a firearm.

Q  Did you have a firearm in your bedroom?

A  Yes.

. . . .

Q  When you went back downstairs with the firearm, did you intend to shoot your brother?

A  No.

Q  Did you intend to kill your brother?

A  No.

Q  Why did you have the firearm with you and in loaded condition?

A  Because I was afraid for my life if I went down there with nothing in my hands.

Q  When you went back down to the living room, can you estimate for us how much time had elapsed between when you got away from your brother and when you were now back down in the living room with the rifle?

A  I would say about 15 seconds.

Q  When you got back downstairs to the living room, where was your brother?

A  He was back over by the fireplace picking up his cookbooks.

Q  Was he kneeling over at that point?

A  He was bent over, yes.

Q  Was his back to you?

A  No.  He was more or less facing me.

Q  Did you say anything to him?

A  No.

Q  Did he say anything to you?

A.  No.

Q  What happened after that?

A  Well, at that point he got up and started to come toward me, and I thought that he was out of his mind at that point.  I was afraid for my life.  I opened fire.

. . . .

Q  You said you thought he was out of his mind?

A  Yes.

Q  What did you base that on?

A  Just the fact that he did what he did in the first place. I don't think beating the hell out of someone is a rational act by somebody, especially your own brother;  that he

would be so mean and cruel. The fact that he was raving—maybe I shouldn't say that.

As far as I know, he was raving about owning the house, which I didn't know anything about. He had been doing some funny little things in the preceding weeks. I would mow the grass, and he would come home from work and attempt to cut the grass the same day. I couldn't understand why he was doing something like that. I think he was just going off in his head.

Q So now your brother was coming towards you and you fired your rifle?

A Yes.

Q Why did you do that?

A I wanted to stop him from hurting me.

*Id.* at 127–31.

Appellant could not recall how many times he shot his brother. After the shooting, appellant telephoned for an ambulance, unloaded the gun, and placed it on the kitchen table.

Mrs. Kacsmar testified as follows. Francis was five years older than appellant and served in Vietnam for three years. She described Francis as authoritative and militaristic; he ordered appellant around. She stated that appellant was slower physically after his stroke and that Francis was impatient with him and did not think appellant was performing as many tasks as he should. In 1988, she placed Francis's name on the deed to her house but never discussed the transfer with appellant.

One of the family's neighbors, James Rushe, also testified. He knew the family for fifteen years, and the two brothers were opposites. While both were friendly, Francis was outgoing, but appellant was quiet. Francis was "pretty tough" on appellant, would "talk to him in a demeaning tone," and call him an "a—h—" and tell him to "hurry up" and to stop "fooling around." *Id.* at 181. He described the two of them together:

Q  Did you ever see Francis treat anybody else the way you saw him treat his brother?

A  Oh, no.  That went on—when they were putting a wall up over the house, that went on.  Every time they worked together—[appellant] used to just turn—to tell you the truth, I don't know how—he just turned and kept his mouth shut.  It hurts to be spoken to like that in front of a neighbor or somebody that is really not tied in as a friend.  I was only in their home maybe four times in the 15 years.

Q  When you would observe any of these incidents, did [appellant] ever retaliate or say anything in his own defense?

A  Once in a while he would say, "give me a break," or something.  "You fix mom's and I will take care of mine."

[Francis] wanted to be the boss.  He wanted to run the show and do this and do it his way, and [appellant] was more methodical, kept to himself. . . .

*Id.* at 181–82.

Lawrence Rock, also a neighbor, testified as follows.  He knew the brothers for approximately seven years and was a friend of Francis.  He described Francis as giving orders all the time and always wanting to be the "boss."  *Id.* at 189.  He observed Francis belittle his brother and after appellant's stroke, Francis often complained about the amount of work that his brother was doing.  He noticed that the brothers did not get along and that there were long periods when they did not speak to one another.  Appellant never complained about his brother.  Mr. Rock stated that Francis carried a weapon in his belt or ankle "all the time" while appellant never carried a gun.  *Id.* at 192.  Francis also used to say that his familiarity with martial arts gave him the ability to kill someone without leaving marks on the body.

Prior to trial, the Commonwealth presented a motion in limine seeking to prohibit appellant from presenting the testimony of Dr. Kenneth Stanko, a psychiatrist, who would have testified based upon his own observations and those of Dr. Christopher Coburn, a doctor of psychology.  Appellant want-

ed to introduce that testimony in part to establish that he reasonably believed that he was in actual danger at the time of the shooting and that testimony should have been admitted to demonstrate his need to defend himself. Appellant's offer of proof was that his fear of death or injury was based partially upon the history of psychological and physical abuse. Dr. Stanko would have explained the characteristics of victims of psychological and physical abuse and would have opined that appellant was the victim of psychological and physical abuse inflicted by his brother based upon certain victim characteristics demonstrated by appellant. The doctor also would have offered an opinion to a reasonable degree of certainty based upon his evaluation that when appellant shot his brother, he was in fear of imminent death or serious bodily injury. Dr. Stanko also would have testified that Dr. Coburn's psychological testing led that doctor to the same conclusions as Dr. Stanko regarding appellant's state of mind. Finally, Dr. Stanko's testimony would have clarified for the jury that when someone has been abused, their thought processes and reactions are different and he would have explained why appellant continued to live in the abusive environment.

The trial court concluded that appellant could not present the psychiatrist's testimony, reasoning that the testimony was impermissible, as its sole purpose was to bolster appellant's credibility. It relied upon a number of cases which have held that the Commonwealth may not introduce expert testimony concerning the veracity of a rape or child abuse victim. On appeal, appellant argues that Dr. Stanko's testimony was precluded erroneously.

Initially, we observe that the standards applicable to a defendant's admission of exculpatory evidence and the Commonwealth's admission of inculpatory evidence differ significantly. This difference is premised upon the application of constitutional guarantees. Our Supreme Court consistently has admonished us that "[a]n accused has a fundamental right to present evidence so long as the evidence is relevant and not excluded by an established evidentiary rule." *Commonwealth v. Ward*, 529 Pa. 506, 509, 605 A.2d 796, 797 (1992), citing

*Chambers v. Mississippi,* 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973). Once it is determined that proffered evidence is relevant, due process requires that it be admitted unless an established evidentiary rule requires its exclusion. *Commonwealth v. Uhrinek,* 518 Pa. 532, 544 A.2d 947 (1988); *Commonwealth v. Greene,* 469 Pa. 399, 366 A.2d 234 (1976).

■ Appellant argues that the testimony of Dr. Stanko was relevant as it would have explained to the jury how the history of abuse by Francis impacted upon the reasonableness of his belief that at the time he shot his brother, he was in danger of death or serious bodily injury and could not retreat. Appellant explains the precise content of the testimony that the doctor would have presented.

Dr. Stanko concluded that appellant had endured lengthy periods of verbal, physical, and emotional abuse and that due to his personality, appellant felt both threatened on the night of the shooting and that he could not escape the abusive situation. Dr. Coburn concluded that appellant exhibited many characteristics of an abused person in that he was isolated socially and lived with his brother and mother in a closed environment. He opined that appellant's environment was similar to that endured by a battered wife. Dr. Coburn concluded that the option of leaving the environment would not have occurred to appellant due to his need to feel safe and secure in the home. Test results indicated that appellant was deeply insecure about his self-worth and this would have reinforced his belief that he could not leave home but had to stay and accept Francis's dominance and abuse. Appellant simply felt that he would be unable to survive outside his home.

We conclude that this evidence was relevant and not excludable under any established evidentiary rule. Defendants traditionally have been permitted to introduce expert testimony regarding their state of mind at the time of a killing. In *Commonwealth v. Light,* 458 Pa. 328, 326 A.2d 288 (1974), our Supreme Court ruled specifically that psychiatric testimony concerning whether the defendant was in subjective fear of death or seriously bodily injury was admissible in a murder

trial. The court concluded that the evidence was relevant on the issue of self-defense, which requires a subjective belief of danger or death, and also relevant to the state of mind required to mitigate murder to manslaughter if the jury should determine that the belief was subjective but not reasonable. *See also Commonwealth v. McCusker,* 448 Pa. 382, 292 A.2d 286 (1972) (psychiatric evidence is admissible on issue of whether a defendant acted in the heat of passion at time of killing); *Commonwealth v. Potts,* 486 Pa. 509, 406 A.2d 1007 (1979) (trial counsel was ineffective for failing to present psychiatric testimony which would have established that due to a personality disorder, defendant was acting in heat of passion at time of shooting); *Commonwealth v. Atwood,* 411 Pa.Super. 137, 601 A.2d 277 (1991) (testimony of practices of people in defendant's profession to establish lack of intent to commit theft was excluded improperly).

More recently, the Pennsylvania Supreme Court held that trial counsel rendered ineffective assistance by failing to present expert testimony on the battered woman syndrome as a defense to homicide charges. *Commonwealth v. Stonehouse,* 521 Pa. 41, 555 A.2d 772 (1989). The *Stonehouse* Court stated expressly, "We shall apply the rule pertaining to the syndrome to men as well as to women." *Id.,* 521 Pa. at 45 n. 1, 555 A.2d at 774 n. 1. The Court held that expert testimony on the syndrome should have been presented in that case since it was not contradicted that the defendant was a victim of abuse and that the jury, without the aid of the expert testimony, was likely to render a verdict based upon erroneous assumptions about the victims of abuse. It opined that expert testimony regarding the battered woman syndrome is admissible as the basis for proving self-defense or justification for the use of deadly force. Specifically, the Court noted that there are myths about the victims of abuse which can be dispelled by expert testimony. The myths, the Court stated, include the one that abused people are masochists who are responsible for the abuse. These "blame the victim" myths, the Court observed, improperly may lead the jury to fail to address why abused people remain in the abusive family situation instead of

leaving. The Court concluded that proper expert testimony could convince the jury to find that the abused defendant was isolated and that at the point of the killing, was justified in believing that no one could help them solve their problem.

We can find no reasoned distinction between the evidence analyzed in *Stonehouse* and the evidence which appellant sought to introduce herein. Dr. Stanko would have testified that appellant suffered from a personality disorder that rendered him socially isolated and highly dependent upon remaining in his childhood home despite an abusive environment. This disorder impacted upon his perception that he could retreat from the abuse and his fear that he was in danger of death or serious bodily injury. Indeed, Dr. Coburn specifically opined that appellant's environment was *similar* to that endured by a battered wife. Furthermore, just prior to the shooting, Francis's physical abuse had escalated in intensity and he had threatened to evict appellant from the home. A jury would not understand how appellant's personality disorder impacted upon his state of mind and why appellant merely did not leave the home after Francis stopped the assault. The fact that appellant endured this abuse was not contradicted but was confirmed by his mother and two independent witnesses.

■ Having determined that the evidence was exculpatory and specifically admissible under precedent, we also must note our disagreement with the trial court's conclusion that the evidence was inadmissible under the established evidentiary rule that an expert may not vouch for the credibility of a witness by opining that the witness is testifying truthfully. The trial court relied upon a number of cases which prohibited testimony concerning child abuse syndrome. The salient feature in those cases, however, is that the expert was permitted to opine that a child abuse victim was testifying truthfully.

In *Commonwealth v. Seese*, 512 Pa. 439, 517 A.2d 920 (1986), an expert was permitted to testify that children who are the same age as the victim in that case do not normally fabricate charges of child abuse. Our Supreme Court held that the sole purpose of this testimony was to bolster the

victim's credibility and this was improper. Similarly, in *Commonwealth v. Dunkle,* 529 Pa. 168, 602 A.2d 830 (1992), our Supreme Court ruled that an expert may not opine that inconsistencies in a victim's testimony and the victim's failure to promptly report sexual abuse were a product of child abuse syndrome rather than fabrication. The Court concluded that this type of opinion testimony is nothing more than an attempt to bolster the victim's credibility and also that the ability to assess why a child victim's testimony is inconsistent is within the ability of an ordinary juror.

In the present case, however, we are not dealing with inculpatory evidence introduced by the Commonwealth. Instead, the constitutional requirement that the defendant should be permitted to present exculpatory evidence applies. Further, the sole purpose of Dr. Stanko's testimony was not to "bolster" appellant's credibility by suggesting that gaps and inconsistencies in the testimony were the result of trauma or that people who are subjected to abuse do not ordinary lie.

■ Instead, the proposed testimony would have aided the jury in evaluating appellant's behavior and state of mind in light of his reclusive personality and the abusive environment. The testimony at issue herein falls squarely within the reasoning of our Supreme Court in *Stonehouse.* The reasonableness of appellant's belief that he was in danger of death or serious injury due to the interplay among appellant's lack of self-esteem and need to live at home and the change in the nature of Francis's abuse on the night of the shooting is not within the understanding of the ordinary juror.

In light of *Stonehouse,* we also must reject the Commonwealth's suggestion that the conviction can be affirmed on the basis of the Court's reasoning in *Commonwealth v. Black,* 474 Pa. 47, 376 A.2d 627 (1977), a case involving self-defense. There, the Court found that under *Commonwealth v. Light, supra,* trial court improperly excluded psychological testimony that appellant was in fear of death or serious injury at the time of the shooting. It also held that the lower court's error in excluding the evidence was harmless.

According to the defendant's testimony in *Black*, he and the victim had quarreled over the telephone, and the victim arrived at the defendant's home in his car, jumped out of the car and while reaching into his pocket, ran toward the defendant, who was standing in an open front door. The defendant claimed that he was frightened by the victim's actions, grabbed a gun which was kept near the front door, and shot. In analyzing Black's claim that he acted in self-defense, the Pennsylvania Supreme Court concluded that the defendant failed to provide evidence to permit a finding that he reasonably believed that the situation warranted the use of deadly force. Black conceded that the victim had not threatened him or displayed a weapon and that he was not close enough to Black when shot to pose an immediate threat. Additionally, the Court noted that Black had grabbed the gun and fired as soon as he saw the victim, ignoring the reasonable alternatives of asking the victim to stop, warning him that he possessed a weapon, or attempting to ascertain the victim's intent.

The Court concluded that even if the evidence had been admitted, self-defense was not established as a matter of law. *See also Commonwealth v. O'Searo,* 466 Pa. 224, 352 A.2d 30 (1976), where the Pennsylvania Supreme Court held that the trial court properly disallowed the defense's expert testimony as to whether defendant accidentally shot the victim during a bar brawl. The Court concluded that the sole purpose of the testimony was to bolster the defendant's credibility and the jury was capable of assessing the accidental nature of a shooting based upon the defendant's testimony.

Initially, we must observe that in *Stonehouse,* the unreasonableness of the defendant's professed fear of death or serious injury was apparent. There, the defendant was standing on the landing of a second story of an apartment while the victim was on the ground. There was no indication that the defendant could not have retreated or that the victim was approaching her. Thus, the unreasonableness of the fear of further attack at the moment of the shooting was apparent. However, the very purpose of the expert testimony on the battered person syndrome is to show why the defendant feels that the

abuse cannot be avoided in the future. In *Black*, the assailant and victim were not in an ongoing abusive relationship. The reasonableness of Black's fear did not depend upon any psychological processes that could not be evaluated based upon objective criteria within the knowledge of the average juror. That is not the case herein. The reasoning in *Stonehouse* clearly applies.

Judgment of sentence reversed and case remanded for a new trial. Jurisdiction relinquished.