[This opinion has been published in *Ohio Official Reports* at 82 Ohio St.3d 202.]

THE STATE OF OHIO, APPELLANT, *v.* NEMETH, APPELLEE.

[Cite as *State v. Nemeth*, 1998-Ohio-376.]

*Criminal law—Murder—Evidence—Evid.R. 702—Expert testimony regarding battered child syndrome in support of a claim of self-defense is admissible.*

(No. 97-534—Submitted February 17, 1998—Decided June 24, 1998.)

APPEAL from the Court of Appeals for Jefferson County, No. 95-JE-32.

_____

{¶ 1} In the early morning hours of January 7, 1995, sixteen-year-old Brian Nemeth took a compound bow and arrows from his room and shot his mother, Suzanne Nemeth, five times in the head and neck. She died eight days later. Brian was tried for aggravated murder and convicted of the lesser included offense of murder.

{¶ 2} At his trial, Brian testified that his mother had been abusive toward him for several years. She drank to excess several nights a week and when she was drinking she would become very angry with him—hitting, slapping, and psychologically abusing him. She would call him derogatory, hurtful names and would spend hours pounding and kicking on his bedroom door, screaming and threatening him. On one occasion she burned him on the palm of his hand with a cigarette, causing a blister and a scar. On another occasion, she cut him on his side with a coat hanger, again leaving permanent scars. She had been seen hitting him across the back with a stick and would also throw things at him. Brian's allegations of abuse by his mother are all supported by corroborating evidence.

{¶ 3} Brian testified that his mother's drinking and abusive behavior had been getting progressively worse since the fall of 1994, when she started working. Due to the escalation in the abuse, Brian was unable to sleep, was crying a lot, and was often shaking and feeling nervous. He had developed persistent headaches and

stomach problems. He would try to get away from his mother by going to his bedroom, locking the door, and holding it closed as she continued to beat on it until she exhausted herself. This would last well into the early morning hours and Brian would not sleep for fear that she would get into his room. The abuse was becoming a nightly occurrence. Brian's brother also testified that his mother's drinking and anger towards Brian had been escalating steadily since the fall of 1994.

{¶ 4} January 6 was Brian's mother's birthday. After school, Brian went to the house of a friend, Nina Mitchell. He knew that his mother would be drinking heavily and, therefore, he was afraid to go home. His mother called twice for him to come home before speaking with Nina's mother, Cynthia Mikita. When Cynthia told Brian he should go home, Nina began crying, and begged Cynthia not to make Brian go. Nina and Brian then tried to explain his mother's abusive behaviors to Cynthia.

{¶ 5} Cynthia did take Brian home, but told him to call if anything happened. As soon as Cynthia left, Brian's mother started screaming and cursing at him and threw a full beer can at him, cutting his lip. He ran to his room and locked the door. He testified that his mother's tone had changed and she was cursing him and threatening to beat his face in. He believed that he was in serious danger. She had removed the phone from his room, so he could not call for help. Instead, he climbed out the window and ran back to the Mikita home.

{¶ 6} Cynthia told Brian he could stay, but insisted on telling his mother where he was. Rather than letting him stay at the Mikita home that night, Brian's mother came to the Mikita house and made him go back home with her. She was visibly drunk. On the way home, she tried to hit and slap him, called him names, and drove erratically. When they arrived at the house, he ran immediately to his room. His mother threatened to kill him. He was crying and shaking. She pounded on his door for several hours. His younger brother, Chris, whose room was next to Brian's, had retreated to the basement earlier in the night to avoid the fighting and

2

to try to sleep. Brian remained in his wet clothes, cold, sweating, unable to focus, and then, around 4:00 a.m., after hours of sitting there listening to his mother's threats and attempts to get into his room, Brian heard her walk away.

{¶ 7} Brian testified, "[S]he walked—I don't know, [s]he kind of—she must have gave up or something. All of a sudden, I just—everything just started coming back to me and I just—the bow was in my room. * * * It was laying on my chair and the way I was facing, I was facing the chair and I was like a robot. I just picked it up and walked out in the hall. * * * I don't even—I don't even know where I was walking to. * * * I just kept on walking out towards the living room and I got to the end of the hall and my mom, she was laying there on the couch. I just started shooting. * * * I only remember the first shot. I blacked out. I found myself on the floor. I went back to my room."

{¶ 8} After shooting his mother, Brian called the police and told them what happened. When they did not arrive immediately, he called back and begged the dispatcher to hurry. He cooperated with the paramedics and confessed to the police. His mother had a blood-alcohol level of 0.20 when she was killed.

{¶ 9} The Juvenile Court of Jefferson County bound Brian over to the Jefferson County Court of Common Pleas and he was subsequently tried as an adult and convicted of murder. Prior to the bindover hearing, Brian was examined by Dr. James R. Eisenberg, Ph.D. Dr. Eisenberg diagnosed Brian as suffering from "battered child syndrome" and as having "very compatible symptoms as do women in abusive relationships." This evidence was presented at the bindover hearing. The report indicated that at the time of the killing, Brian was frightened for his life and terrified by the way his mother had been acting.

{¶ 10} Prior to trial, the state filed a motion *in limine* to prevent the defense from introducing any psychological testimony relating to battered child syndrome. Defense counsel filed a memorandum in opposition and a motion for appointment

of an expert. The court overruled the defense request for an expert and barred any use of the battered child syndrome in support of a claim of self-defense.

**{¶ 11}** Nonetheless, at the close of its case, the defense proffered the testimony of Dr. Eisenberg as an expert on battered child syndrome. The proffered testimony would have explained the psychological effects of long-term child abuse, including the effect on a child's perception of danger. The testimony was proffered in support of a self-defense theory, as well as evidence that a charge on a lesser included offense would be justified.

**{¶ 12}** The proffered testimony was not admitted into evidence. The defense requested that the court charge the jury on voluntary manslaughter, as well as the indicted crime of aggravated murder and its lesser included offense, murder. The court overruled the request. The jury found Brian guilty of the lesser included offense of murder.

**{¶ 13}** The court of appeals reversed Brian's conviction and remanded the cause for a new trial. The court of appeals held that the defense had put forth sufficient evidence to warrant the admission of expert testimony regarding battered child syndrome, in support of a claim of self-defense, and that preclusion of such testimony was prejudicial.

**{¶ 14}** This cause is now before this court upon the allowance of a discretionary appeal.

_____

*Stephen M. Stern*, Jefferson County Prosecuting Attorney, and *Christopher D. Becker*, Assistant Prosecuting Attorney, for appellant.

*Adrian V. Hershey*, for appellee.

_____

**MOYER, C.J.**

{¶ 15} The issue in this case is whether Ohio recognizes "battered child syndrome" as a valid topic for expert testimony in the defense of parricide. Expert testimony on battered child syndrome is admissible in Ohio courts when it is relevant and meets the requirements of Evid.R. 702. The defendant, Brian Nemeth, has been diagnosed with battered child syndrome and it is relevant to his defense in a variety of ways. Further, the testimony proffered by the defense on battered child syndrome meets the requirements of Evid.R. 702. Therefore, although the syndrome is not recognized as an independent defense in Ohio, the trial court erred in prohibiting expert testimony on the syndrome in support of a claim of self-defense or as justification for an instruction on a lesser included offense to murder. We, therefore, affirm the decision of the court of appeals.

I

{¶ 16} Part of the difficulty we face in addressing this case is the inadequacy of the shorthand labels we have tried to place on the psychological characteristics associated with abused children and other battered persons. In *Koss*, we adopted the term "battered woman syndrome" as a legal term of art referring to the characteristics and symptoms associated with women who are battered by their spouses or significant others. *State v. Koss* (1990), 49 Ohio St.3d 213, 551 N.E.2d 970. The term was defined by Lenore E. Walker in her book, The Battered Woman Syndrome (1984), which explained the psychological effects suffered by battered women.

{¶ 17} Today we are asked to address what some courts have loosely termed "battered child syndrome." Unlike battered woman syndrome, the term "battered child syndrome" was long ago adopted as a term of art in the medical community as the label for a set of physical symptoms that provide proof of child abuse. The battered child syndrome has been used for over thirty years in this context and has been accepted by the medical and legal community as a means of proving that a

child has been abused. Only recently have attempts been made to expand this label to include a set of psychological symptoms or behavioral effects suffered by victims of child abuse. Many courts have been reluctant to allow evidence on the psychological effects of battered child syndrome because they do not believe that there is sufficient scientific proof that psychological markers can in and of themselves identify a battered or abused child.

{¶ 18} Identifying an abused child based solely on a psychological profile, however, is an entirely different matter than recognizing that children who have been abused share a set of characteristic psychological symptoms.[1] These symptoms may not be exclusive to abused children, but most abused children demonstrate these symptoms to varying degrees. See, generally, footnotes 2 and 3, *infra*. These symptoms have been well documented and universally noted in the psychiatric and medical community. Unfortunately, that community has not adopted a universal label for these symptoms.

{¶ 19} Some experts have tried to incorporate the psychological effects of child abuse under the label of "battered child syndrome"; some distinguish it from the physical syndrome by calling it "child abuse syndrome"; still others address it as a form of posttraumatic stress disorder or acute stress disorder. See Diagnostic and Statistical Manual of Mental Disorders (4 Ed.1994) 424-431 ("DSM-IV"). It has also been labeled as "characterological sequelae of prolonged victimization," and "traumatic bonding," for example. See Posttraumatic Stress Disorder: DSM-IV and Beyond (1993) 219-220. Regardless of the label, however, the behavioral and psychological characteristics which may manifest in abused children have been universally and consistently recognized in the scientific community since at least

---

1. Since oral arguments were presented in this case, we have held that the prosecution in a child abuse case may present expert testimony on the characteristic psychological symptoms of a typical abused child as evidence supporting allegations that a particular child has been abused. See *State v. Stowers* (1998), 81 Ohio St.3d 260, 690 N.E.2d 881.

1962. See Kempe, Silverman, Steele, Droegemueller & Silver, The Battered-Child Syndrome (1962), 181 J.Am.Med.Assn. 17, 18-20 (describing the psychological and physiological harm caused by child abuse).

{¶ 20} Because the issue has been raised in this case using the term "battered child syndrome" to refer to the psychological and behavioral characteristics of abused children, we will continue to use this label throughout this opinion, recognizing that this encompasses the same characteristics identified under numerous labels and which are set forth most specifically under the diagnostic criteria of posttraumatic stress disorder.

II

{¶ 21} The defense in this case did not ask that battered child syndrome be recognized as a new defense or an independent justification for the killing of an abusive parent. The proffer made at trial was limited to expert testimony that would explain the psychological effects of long-term child abuse, and was proffered in support of a self-defense theory as well as a charge on voluntary manslaughter. As such, the issue before us is an evidentiary matter and is governed by the Ohio Rules of Evidence. Because there was no basis for excluding the testimony under the Rules of Evidence, and because we find that the trial court's exclusion of this testimony to be prejudicial to the defendant, we need not reach the constitutional issues addressed by the court of appeals.

{¶ 22} We have previously held that "[t]he Ohio Rules of Evidence establish adequate preconditions for admissibility of expert testimony * * *." *State v. Williams* (1983), 4 Ohio St.3d 53, 4 OBR 144, 446 N.E.2d 444, syllabus. Courts should favor the admissibility of expert testimony whenever it is relevant and the criteria of Evid.R. 702 are met. See *id*. at 57-58, 4 OBR at 148, 446 N.E.2d at 447.

{¶ 23} Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Evid.R. 401. Evidence that

would support a defendant's explanation of the events at issue and would provide evidence as to his possible state of mind at the time of the incident is clearly relevant to his or her defense. In this case, the testimony on battered child syndrome, which was proffered by the defense, is relevant for at least four separate purposes, including the determination of whether Brian (1) had acted with prior calculation and design as charged in the indictment, (2) had acted with purpose as required for the lesser included offense of murder, (3) had created the confrontation or initiated the aggression, and (4) had an honest belief that he was in imminent danger, a necessary element in the affirmative defense of self-defense.

{¶ 24} General information on battered child syndrome would also tend to show that Brian's behavior was consistent with that of an abused child and would lend support to his testimony that he had been abused both generally and just prior to the killing. See *State v. Stowers* (1998), 81 Ohio St.3d 260, 262, 690 N.E.2d 881, 883-884. We have held that an expert may not offer an opinion as to the truth of a child's statement. However, an expert may provide testimony that supports "the truth of the *facts testified to* by the child, or which assists the fact finder in assessing the child's veracity." (Emphasis *sic*.) *Id*. at 262-263, 690 N.E.2d at 884. Expert testimony on battered child syndrome would, in this case, tend to enhance the probability that Brian's account of the facts leading up to the killing was truthful and would lend credibility to his assertion that he was in a state of rage and dissociation at the time of the killing. A diagnosis of battered child syndrome and an explanation of its effects would therefore be relevant in determining whether the case warranted a jury charge on voluntary manslaughter.

III

**{¶ 25}** In addition to the requirement of relevancy, expert testimony must meet the criteria of Evid.R. 702. Rule 702 provides that a witness may testify as an expert if all of the following apply:

"(A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;

"(B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony;

"(C) The witness' testimony is based on reliable scientific, technical, or other specialized information. * * * "

**{¶ 26}** The first prong of the rule is satisfied in this case. This trial presents precisely the kind of situation in which expert testimony is most necessary. As we recognized in *Koss,* when we accepted evidence on battered woman syndrome, testimony on the syndrome or psychological effects of abuse is essential to proving the elements of a self-defense claim. Nonconfrontational killings do not fit the general pattern of self-defense. Without expert testimony, a trier of fact may not be able to understand that the defendant at the time of the killing could have had an honest belief that he was in imminent danger of death or great bodily harm. Further, it is difficult for the average person to understand the degree of helplessness an abused child may feel. Thus, expert testimony would also " 'help dispel the ordinary lay person's perception that a [person] in a battering relationship is free to leave at any time.' " *Koss*, 49 Ohio St.3d at 216, 551 N.E.2d at 973, quoting *State v. Hodges* (1986), 239 Kan. 63, 68-69, 716 P.2d 563, 567. In either instance, the expert testimony " 'is aimed at an area where the purported common knowledge of the jury may be very much mistaken, an area where jurors' logic, drawn from their own experience, may lead to a wholly incorrect conclusion * * *.' " *Koss* at 217,

551 N.E.2d at 974 (quoting *State v. Kelly* [1984], 97 N.J. 178, 206, 478 A.2d 364, 378).

{¶ 27} Expert testimony as to the effects of abuse may also help to counter popular misconceptions about the nonreporting of abuse. Prolonged exposure to abuse results in feelings of powerlessness, embarrassment, fear of reprisal, isolation, and low self-esteem. See, generally, footnotes 2 and 3, *infra*. These effects often prevent a child from seeking help from third parties. The abusive parent also generally becomes adept at concealing the abuse from outsiders. Note, Toffel, Crazy Women, Unharmed Men, and Evil Children: Confronting Myths About Battered People Who Kill Their Abusers, and the Argument for Extending Battering Syndrome Self-Defenses to all Victims of Domestic Violence (1996), 70 S.Cal.L.Rev. 337, 364. The effects of abuse thereby diminish the likelihood that the defense will be able to present corroborating testimony of third parties.

{¶ 28} Absent corroborating evidence, a trier of fact is likely to believe that the abuse allegations are fabricated in response to the charges levied against the child-defendant. The existence and prevalence of such misconceptions are evident in the transcript of this trial. The prosecution repeatedly stressed that Brian could have left the house again, that he could have gone to his father or grandparents, that he was not in actual imminent danger at the time of the killing, and implying that he must have created the allegations of abuse after the fact because, otherwise, more people would have known about it. Even the trial court judge questioned whether there was corroborating evidence of abuse before granting the state's motion *in limine,* excluding testimony on battered child syndrome in connection with a claim of self-defense.

{¶ 29} It is the lack of corroborating evidence that makes expert testimony even more crucial in these cases. The defense needs expert testimony to refute the seemingly logical conclusion that serious abuse could not be taking place if no one outside the home was aware of it. Expert testimony is also necessary to dispel the

misconception that a nonconfrontational killing cannot satisfy the elements of self-defense, and to counter prosecutorial attacks on the defendant's credibility based on the nonreporting of abusive incidents. In *Koss*, we accepted that expert testimony is necessary to explain that the nonreporting of abuse and the failure to retreat from an allegedly abusive environment are not inconsistent with a claim of severe abuse. Surely, if we accept nonreporting and failure to retreat by adults, the reasons for such conduct are even more understandable when a child is the subject of the abuse.

{¶ 30} The second prong of the test has not been challenged. The trial court disallowed any testimony as to battered child syndrome and did not specifically challenge the qualifications of Dr. Eisenberg.

{¶ 31} The final requirement for the admission of testimony by experts is whether the testimony is based on reliable scientific, technical, or other specialized information. Dr. Eisenberg's testimony was based on scientific, technical, or otherwise specialized information. He is a trained psychologist who has specialized training in the behavioral and psychological effects of child abuse. The only question remaining is whether the information supporting his opinion is sufficiently reliable.

IV

{¶ 32} Evid.R. 702 does not define "reliability" in the context of admitting expert testimony. "Consistently with the intention to do no more than codify existing holdings on the admissibility of expert testimony, the amended rule [Evid.R. 702] does not attempt to define the standard of reliability but leaves that to further development through case-law." Evid.R. 702, July 1, 1994 Staff Note. The Staff Note does, however, specifically endorse previous court holdings that rejected the " 'general acceptance' within a relevant scientific community" test established in *Frye v. United States* (C.A.D.C.1923), 293 F. 1013. The Staff Note also reinforced the directive that questions of reliability are to be directed at

principles and methods used by an expert in reaching his or her conclusions, rather than trying to determine whether the conclusions themselves are correct or credible.

**{¶ 33}** Thus, pursuant to the directives of this court in the Rules of Evidence, and consistent with our previous holding in *State v. Williams*, scientific opinions need not enjoy "general acceptance" in the relevant scientific community in order to satisfy the reliability requirement of Evid.R. 702. Further, there need not be any agreement in the scientific community regarding the expert's actual opinion or conclusion. The credibility of the conclusion and the relative weight it should enjoy are determinations left to the trier of fact. See, *e.g.*, *State v. Buell* (1986), 22 Ohio St.3d 124, 132-133, 22 OBR 203, 210, 489 N.E.2d 795, 804. " ' "General scientific acceptance" is a proper condition for taking judicial notice of scientific facts, but not a criterion for the admissibility of scientific evidence. Any relevant conclusions which are supported by a qualified expert witness should be received unless there are other reasons for exclusion.' " (Footnote omitted.) *State v. Williams*, 4 Ohio St.3d at 57, 4 OBR at 147, 446 N.E.2d at 447, citing McCormick, Evidence (2 Ed. Cleary Ed.1972) 491, Section 203.

**{¶ 34}** Prior to the 1994 amendment of Evid.R. 702, the threshold standard of reliability for admission of expert testimony had been stated in a variety of ways. In *Koss*, the court stated that "battered woman syndrome has gained *substantial scientific acceptance* to warrant admissibility." (Emphasis added.) *State v. Koss*, 49 Ohio St.3d at 217, 551 N.E.2d at 974. The General Assembly enacted R.C. 2901.06(A)(1) in 1990, which declares that battered woman syndrome is currently a matter of "*commonly accepted scientific knowledge*." (Emphasis added.) In *State v. Pierce*, a unanimous court determined that reliability was not an issue to be considered in determining admissibility, but instead goes solely to the weight of the evidence. *State v. Pierce* (1992), 64 Ohio St.3d 490, 597 N.E.2d 107, paragraph two of the syllabus, and 501, 597 N.E.2d at 115.

**{¶ 35}** Since *Pierce*, however, Evid.R. 702 was amended, specifically adding the requirement that the information forming the basis of the expert testimony be "reliable." We have decided only two cases concerned specifically with Evid.R. 702 since the amendment: *State v. Stowers*, 81 Ohio St.3d 260, 690 N.E.2d 881, and *Miller v. Bike Athletic Co*. (1998), 80 Ohio St.3d 607, 687 N.E.2d 735.

**{¶ 36}** *Stowers* addressed psychological expert testimony as "specialized knowledge" rather than "scientific or technical knowledge." We held that expert testimony based on "specialized knowledge" is admissible " 'if a person has information which has been acquired by experience, training or education which would assist the trier of fact in understanding the evidence or a fact in issue.' " *Stowers* at 262, 690 N.E.2d at 883. This standard was taken from a pre-amendment case, *State v. Boston* (1989), 46 Ohio St.3d 108, 545 N.E.2d 1220. At the time *Boston* was decided, this standard simply reiterated the language of the evidentiary rule. At that time, there was no requirement of reliability in the rule. Although the Staff Note to the amended rule was clearly meant to codify this court's interpretation of the rule's pre-amendment language, it also specifically notes that the "assist the trier" language of the old rule (quoted as the standard in *Stowers*) is vague and misleading and is replaced by the express requirements of the amended rule. Part of this codification is an express requirement that the information forming the basis of an expert's opinion be reliable. As *Stowers* does not specifically address the issue of reliability under the amended rule, we must look elsewhere to determine what the threshold standard of reliability is, and whether expert testimony on battered child syndrome meets that standard.

**{¶ 37}** In *Miller*, the court designated the following four factors to be considered in evaluating the reliability of scientific evidence: (1) whether the theory or technique has been tested, (2) whether it has been subjected to peer

review, (3) whether there is a known or potential rate of error, and (4) whether the methodology has gained general acceptance.

{¶ 38} These factors were adopted from *Daubert v. Merrell Dow Pharmaceuticals, Inc*. (1993), 509 U.S. 579, 593-594, 113 S.Ct. 2786, 2797, 125 L.Ed.2d 469, 482-483. Both the United States Supreme Court in *Daubert* and this court in *Miller* were careful to emphasize that none of these factors is a determinative prerequisite to admissibility. *Miller* at 612-613, 687 N.E.2d at 741; *Daubert* at 593, 113 S.Ct. at 2797, 125 L.Ed.2d at 483.

{¶ 39} Relevant evidence based on valid principles will satisfy the threshold reliability standard for the admission of expert testimony. The credibility to be afforded these principles and the expert's conclusions remain a matter for the trier of fact. The reliability requirement in Evid.R. 702 is a threshold determination that should focus on a particular type of scientific evidence, not the truth or falsity of an alleged scientific fact or truth. " 'In other words, the court need not make the initial determination that the expert testimony or the evidence proffered is true before submitting the information to the jury.' " *State v. Pierce,* 64 Ohio St.3d at 501, 597 N.E.2d at 115, quoting *United States v. Jakobetz* (C.A.2, 1992), 955 F.2d 786, 796-797. While a clearer definition of reliability may need to be developed in order to address other factual situations, the guidance currently available is sufficient for this court to determine the admissibility of the testimony proffered in this case.

V

{¶ 40} Though it is not necessary to show general acceptance to pass the threshold of reliability for the admission of expert testimony, the behavioral and psychological effects of prolonged child abuse on the child have been generally accepted in the medical and psychiatric communities and therefore unquestionably meet the requisite level of reliability for admission as the subject of expert testimony.

{¶ 41} It is also well recognized in the scientific community that child abuse need not involve excessive or debilitating physical violence to affect the emotional and psychological development of the child. See Comment, Moreno, Killing Daddy: Developing a Self-Defense Strategy for the Abused Child (1989), 137 U.Pa.L.Rev. 1281, 1302. "Child abuse consists of a multitude of nonaccidental physical and psychological traumas to children, in the vast majority of cases, over an extended period of time. Acts of abuse include such bodily violence as beating, squeezing, lacerating, binding, burning, suffocating, poisoning, or exposing to excess heat or cold. Abuse also includes such psychological traumas as sensory overload with light, sound, stench, aversive taste, itching, pain, or prevention of sleep and verbal overload with insults, accusations, and indoctrination." Handbook of Clinical Child Psychology (1983) 1220.

{¶ 42} The behavioral and psychological effects of child abuse, or battered child syndrome, are most often discussed as a form of posttraumatic stress disorder ("PTSD"). PTSD is an anxiety disorder listed in the DSM-IV, which categorizes universally recognized mental disorders. This specific disorder has been recognized in children at least since 1987 when the DSM-III-R was published. The fourth and most recent edition of the manual specifically notes that PTSD can manifest in children.[2] The triggering event for posttraumatic stress disorder can be any traumatic event that involved "actual or threatened death or serious injury, or a threat to the physical integrity of self or others" and where the person's response involved "intense fear, helplessness, or horror." DSM-IV at 427-428.

---

2. Many other medical sources recognize that PTSD can manifest in children as a result of child abuse. See, *e.g*., Post-traumatic Stress Disorder: Assessment, Differential Diagnosis and Forensic Evaluation (1990) 28; The Battered Child (4 Ed.1987) 295; Post-Traumatic Stress Disorder in Children (1985) 135-152; Porterfield, Straight Talk About Post-traumatic Stress Disorder (1996) 77; Encyclopedia of Psychiatry, Psychology, and Psychoanalysis (1996) 94; Posttraumatic Stress Disorder: DSM-IV and Beyond, *supra*, at 215-219; Kaplan and Sadock's Synopsis of Psychiatry, Behavioral Sciences, and Clinical Psychiatry (7 Ed.1994) 786.

**{¶ 43}** The DSM-IV also identifies a specific set of symptoms that occur when the triggering event is an interpersonal stressor such as childhood physical abuse or domestic battering. *Id*. at 425. These effects include excessive fear and anxiety, abnormal expressions of aggression or impaired impulse control, reenacting or psychologically reexperiencing the abuse, avoidance (often in the form of hypervigilance), helplessness, somatic complaints, and various forms of dissociation. See, *e.g.*, DSM-IV at 425; Handbook of Clinical Child Psychology, *supra*, at 1228-1230; Williams, Post-Traumatic Stress Disorder and Child Sexual Abuse: The Enduring Effects (1990) 134-135; Child Abuse and Neglect: A Medical Reference (1981) 97-99; The APSAC Handbook on Child Maltreatment (1996) 77-78; The Psychologically Battered Child (1986) 61-65; Posttraumatic Stress Disorder: DSM-IV and Beyond, *supra*, at 215-223.

**{¶ 44}** This court has already recognized that posttraumatic stress disorder in children is a proper subject for expert testimony. *State v. Bidinost* (1994), 71 Ohio St.3d 449, 644 N.E.2d 318, paragraph one of the syllabus.

**{¶ 45}** In addition to this explicit recognition of battered child syndrome, the psychological effects of abuse suffered by battered children are equivalent to the effects of prolonged abuse experienced by abused women and have been recognized as appropriate for expert testimony in the context of battered women. The psychiatric and legal communities have clearly accepted that despite any minor differences in the degree of power differentials between the batterer and the abused, the psychological effects of family violence are legally indistinguishable whether suffered by children or adults.[3]

---

3. See, *e.g*., DSM-IV at 425; Posttraumatic Stress Disorder: DSM-IV and Beyond, *supra*, at 219-220; *State v. Janes* (1993), 121 Wash.2d 220, 850 P.2d 495 (*en banc); State v. Holden* (Sept. 26, 1985), Cuyahoga App. No. 49566 unreported, 1985 WL 8630; Comment, Turk, Abuses and Syndromes: Excuses or Justifications? (1997), 18 Whittier L.Rev. No. 4, 901, 925; Hicks, Admissibility of Expert Testimony on the Psychology of the Battered Child (1987), 11 Law & Psychol.Rev. 103, 105; Note, Toffel, Crazy Women, Unharmed Men, and Evil Children: Confronting the Myths About Battered People Who Kill Their Abusers, and the Argument for

VI

**{¶ 46}** Several states have allowed the defendant to present expert testimony of a "battered child" or "battered person" syndrome where a child has killed or attempted to kill an abusive family member. See, *e.g.*, *State v. Janes* (1993), 121 Wash.2d 220, 850 P.2d 495 (*en banc*); *State v. Hines* (1997), 303 N.J.Super. 311, 324, 696 A.2d 780, 787 (*State v. Janes* cited with approval); *State v. Gachot* (La.App.1992), 609 So.2d 269 (state law allows evidence of battered child syndrome as support to claim of self-defense); *Commonwealth v. Kacsmar* (1992), 421 Pa.Super. 64, 617 A.2d 725 (trial court improperly excluded evidence of "battered person syndrome" where defendant claimed self-defense in shooting of abusive brother); *In Matter of Appeal in Maricopa Cty.* (App.1994), 182 Ariz. 60, 893 P.2d 60; see, also, Margolick, When Child Kills Parent, It's Sometimes to Survive, N.Y. Times, Feb. 14, 1992 at A1, D20 (seventeen-year-old Donna Wisener acquitted of nonconfrontational killing of abusive father after introducing testimony on battered child syndrome in Texas).

**{¶ 47}** Still others, while not faced with the issue of expert testimony, have recognized that abused children may exhibit identifiable psychological characteristics that point to a causal connection between the abuse and the killing of the abuser. See, *e.g.*, *People v. Cruickshank* (1985), 105 A.D.2d 325, 484 N.Y.S.2d 328; *State v. Crabtree* (1991), 248 Kan. 33, 805 P.2d 1; see, also, Chambers, Children Citing Self-Defense in Murder of Parents, N.Y. Times, Oct. 12, 1986, Section 1, at 38. In many of these cases, the court acknowledged that abuse may have been a factor in the killing but did not accept a self-defense theory because the killing occurred in a nonconfrontational setting. While self-defense

---

Extending Battered Syndrome Self-Defenses to All Victims of Domestic Violence (1996), 70 S. Cal.L.Rev. No. 1, 337, 350-351. This listing is by no means comprehensive. Virtually every legal journal which discusses battered child syndrome as a defense to parricide notes its similarity to battered woman syndrome.

was not accepted as a viable defense, most of these cases recognized a diminished level of culpability.

**{¶ 48}** Six states have enacted statutes that allow the presentation of testimony regarding the psychological effects on victims of domestic violence, including children, in cases where the victim of abuse is on trial for acts of violence against the abuser. Tex.Code Crim. Pro. Art. 38.36(b)(2) (1997); Georgia Code 16-3-21(d)(2) (1997); Nevada Rev. Stat. 48.061 (1997); La. Stat. Ann. 404(A)(2) (1997); Cal. Evid.Code 1107 (1997)[4]; and Utah Crim.Code 76-2-402(5).[5]

## VII

**{¶ 49}** While specific legislation may be helpful in defining the parameters of a new defense, such legislative action is not necessary in order for us to determine whether expert testimony concerning battered child syndrome meets the evidentiary requirements of Evid.R. 702 and whether it should therefore be admissible in appropriate cases. Battered child syndrome is not a new defense or justification for murder. We are making no new law with this opinion. Pursuant to well-established Rules of Evidence and case law dealing with the admission of expert testimony, we hold that the proffered expert testimony on battered child syndrome was both relevant and reliable and that the trial court in this case erred in

---

4. While the California statute refers specifically to the admission of expert testimony on battered woman syndrome, it also allows testimony on the "physical, emotional, or mental effects upon the beliefs, perceptions, or behavior of victims of domestic violence" as defined in Cal.Fam.Code 6211; Cal.Evid. Code 1107 (1997). The definition of domestic violence under this Family Code section includes abuse perpetrated against the child of a party and any person related by consanguinity or affinity within the second degree. This would include parental abuse of children. Cal.Fam.Code, Section 6211(f) (West 1998).

5. Although the Utah statute does not specifically deal with the admissibility of expert evidence, the House Bill indicates that it is intended to clarify that otherwise competent evidence regarding a victim's response to patterns of abuse or violence in the parties' relationship is to be considered by the trier of fact when determining imminence or reasonableness in the act of self-defense. Utah Crim.Code 76-2-402 (Michie 1997); Am.H.B. No. 13, Laws of Utah, Ch. 26, Section 2 (reprinted in Utah Legislative Report 1994, at 18).

granting the motion prohibiting the testimony. Because the preclusion of such testimony was prejudicial, we affirm the holding of the court of appeals, which vacated the defendant's conviction and remanded the cause for a new trial.

*Judgment affirmed*

*and cause remanded.*

PFEIFER, COOK and LUNDBERG STRATTON, JJ., concur.

RESNICK, J., concurs in judgment.

DOUGLAS, J., dissents.

F.E. SWEENEY, J., dissents and would reverse the judgment of the court of appeals.

————————————