Defendant-appellant Leonard Hughes appeals his convictions on count one, murder, in violation of R.C. 2903.02; count two, attempted murder of a peace officer, in violation of R.C.2923.02/R.C. 2903.11(B); and count four, having a weapon while under a disability, in violation of R.C. 2923.13. The appellant was found guilty of two firearm specifications on each of counts one and two. Counts one and two were tried to a jury, count four was tried to the bench.
The appellant was sentenced to a term of incarceration of fifteen years to life on count one, ten years incarceration on count two, and one year incarceration on count four, each sentence to be served consecutively. The court imposed a term of incarceration of three years for the gun specification on count one pursuant to R.C. 2941.145, and an additional three-year term of incarceration on count two for the gun specification pursuant to R.C. 2941.145. Each gun specification was ordered to be served prior to and consecutively with each count and with each other. A total of thirty-two years of incarceration was imposed upon the appellant. In addition, the court ordered that the appellant be placed in solitary confinement on December 30 of each year.
On December 30, 1996, the appellant shot and killed Cleveland Police Officer Hilary S. Cudnik, Sr., and attempted to murder Cleveland Police Officer Frank Costanzo. Officer Costanzo testified that on December 29, 1996, he and his partner, Officer Cudnik, were assigned to work from 8:00 p.m. to 4:00 a.m. in the fifth district. Officer Cudnik drove the zone car while Officer Costanzo manned the radio and undertook the responsibility of making reports.
At approximately 1:55 a.m., having just finished assisting on a break-in on East 116th Street, the officers were proceeding westbound on Woodland near East 75th Street. At the red light, Officer Costanzo observed a Buick in the curb lane which was edging up into the intersection. Officer Costanzo noticed that the trunk lock had been punched, indicating that the vehicle may have been stolen. He radioed in the license plate and learned that the plate had indeed been stolen. Although the windows of the vehicle were tinted, the officers could see that there was only one occupant of the Buick. The driver was acting nervous, as though he was contemplating going through the red light.
The officers attempted to stop the appellant's vehicle near East 66th Street and Woodland. When Officer Cudnik turned on the police lights, the appellant's vehicle turned north onto East 71st Street. Immediately after the turn, the appellant slowed his vehicle down to a stop in the middle of the street. This area near the Woodland cemetery was very dark and, while still in the zone car, Officer Costanzo shined his flashlight into the appellant's vehicle; he testified that "I just didn't feel right (T. 1283)." After Officer Costanzo opened his door, without exiting his vehicle, the appellant then began driving away at ten to fifteen miles per hour. The police lights and sirens remained on, and the officers continued their pursuit.
The appellant preceded the zone car as they passed under the green light at the intersection of East 71st and Quincy. As the vehicles approached the red light at Central, the appellant proceeded through the intersection. Officer Costanzo radioed in this information and asked for assistance. A zone car located on the northeast corner of Cedar joined the pursuit. Officer Costanzo testified that based upon his experience, in a situation such as this, where officers are pursuing a vehicle with stolen plates, the driver of the vehicle will bail out (T. 1288). In this particular instance, it was the expectation of the officers that the appellant would jump out of his vehicle and run (T. 1289).
As the appellant approached East 71st Street and Carnegie, his Buick turned right and drove east onto Carnegie. As the turn was made, Officer Costanzo noted that the appellant's window was down and that the appellant was leaning toward the passenger side of his vehicle. Officer Costanzo remarked to Officer Cudnik that he believed the appellant would bail out on the passenger side of the vehicle (T. 1290, 1291). From his observation of the driver through the open window, Officer Costanzo was able to identify the appellant in court.
As the appellant approached East 77th Street, he remained in the curb lane and rolled up the car window. At the southeast corner of East 77th Street and Carnegie there were two parked vehicles. Officer Cudnik stayed to the left and rear of the appellant's vehicle effectively preventing him from proceeding further on East 77th Street. The appellant made a sharp right turn onto East 77th Street and struck both the curb and the corner of the building. The officers' zone car came to rest slightly past the appellant's vehicle. The other assisting zone cars stayed behind the appellant's vehicle. At this time it was approximately 2:02 a.m. on December 30, 1996, and approximately three to four minutes since the officers first noticed the appellant. Officer Costanzo also testified that the area of East 77th Street and Carnegie is well lit due to streetlights and the scrap yard on the southwest corner.
After the appellant's vehicle came to rest, and the zone car stopped, Officer Costanzo exited the zone car from the passenger door. The appellant was leaning towards the passenger door of the Buick. As he exited the zone car, Officer Costanzo had his weapon drawn, but down by his leg. He held his flashlight in his left hand, but placed it in his belt as he ran towards the appellant's vehicle. Only seconds elapsed from the time both cars stopped and Officer Costanzo exited his vehicle and proceeded towards the appellant's vehicle. The driver's side door of the appellant's vehicle flew open, Officer Costanzo stopped because he still believed the appellant would exit through the passenger side door. The next thing Officer Costanzo observed was an assault rifle. The barrel was approximately one foot from Officer Costanzo's head, the appellant fired twice (T. 1304). Officer Costanzo felt a flash hit his face. Afterwards, Officer Costanzo could not hear and believed that he had been shot in the ear. Officer Cudnik was somewhere behind Officer Costanzo at that point in time.
After the appellant fired the first two shots, Officer Costanzo fired two rounds into the appellant's vehicle, and then ran to the back of the vehicle, seeking cover. Officer Costanzo testified that the first two shots from the appellant's vehicle were very loud and that: "Just everything was so loud. And then a lot of loud popping noise from there, and then the people here from this side, they were shooting at him." (T. 1308.) Officer Costanzo explained that the sound of an assault rifle is much louder than the police nine millimeter guns, the assault rifle sounds like a pop (T. 1314). He estimated that he heard twelve of the louder pops (T. 1314).
From his position of cover behind the appellant's vehicle, Officer Costanzo fired three rounds into the back window of the vehicle. Since the appellant was still moving around in his vehicle, and desiring to get out of harm's way, Officer Costanzo fell to the ground. Another officer inquired as to whether or not he was hurt, Officer Costanzo replied that he did not know. Because he could hear policemen shooting, and loud pops (T. 1307), he quickly stood up. He observed that the appellant was out of his vehicle. Officer Costanzo fired two more shots and the appellant fell. In total, Officer Costanzo testified that he fired seven shots. Other officers then secured the appellant.
The first priority for Officer Costanzo was to locate his partner, Hilary Cudnik. He found Officer Cudnik, unmoving, lying on the street bleeding from the right side of his head. Officer Cudnik's glasses were laying in the street, next to his body. Another zone car arrived at the scene and transported Officer Cudnik to Mt. Sinai Hospital.
Officer Costanzo was also taken to Mt. Sinai, treated, and released. Although he was not actually shot, Officer Costanzo suffers from ringing, and sometimes burning, in his ear.
Brenda Wynn Moree testified that at approximately 2:00 a.m. she was working at Lancer's Steak House. From her position within the building she had a clear view of the whole Carnegie area. She observed a flash of lights and saw police vehicles. From the vehicle closest to her, she observed two officers exit, one from the passenger side and one from the driver's side. She saw someone with a rifle step out of the vehicle onto the curb. When the man raised the rifle, and she realized that he was about to begin shooting, she ducked behind the bar. She testified:
Q. When you go down, what happens?
 A. Well, I hear all this gun fire and everything, and, you know, I'm hollering to everybody in the bar, and then I stand back up, and it's like all over.
Q. How long are you down there?
A. About a minute.
(T. 1372).
When she stood up, she observed one man on the ground and a police officer lying in the street.
The testimony of Cleveland Police Officers Terrence Potts and Albert McCue corroborated the testimony of Officer Costanzo. Officers Potts and McCue were in the zone car 543, the first police vehicle which joined in the pursuit of the appellant. Officer McCue, the driver, stopped the zone car behind and a little to the left of the appellant's vehicle. Officer Potts, the passenger, observed the appellant quickly push open his driver's side door. While Officer Potts could see the top of the appellant's gun barrel, he could not see who was holding the gun. Officer Potts heard Officer Costanzo yell 'drop the gun' prior to hearing shots. When Officer Potts first heard shots, he could not be certain whether or not the appellant was inside or outside of his vehicle. Potts observed the appellant running with a rifle in his hands and looking left to right, swinging the gun, pointing it in all directions (T. 1409). Officer Potts stated that he estimated that he heard four to six shots fired from the appellant's rifle. He testified that he fired thirteen shots at the appellant at the time the appellant began to flee eastbound on Carnegie.
Officer McCue placed his zone car in such a position that the appellant would be unable to back up and renegotiate the turn down East 77th Street. From his vantage point, Officer McCue observed the appellant's driver's side door being kicked open. At this point, Officer Costanzo was approaching the rear of the appellant's vehicle. Officer McCue heard Costanzo yelling 'gun' and next heard several loud bangs. He ducked towards his vehicle to take cover. After the shots, he observed a leg coming out of the appellant's vehicle and what appeared to be a barrel of a rifle. After the firing started, he observed that the appellant's rifle was pointed at zone car 555 and the area where Officer Cudnik was located. Officer McCue observed Officer Cudnik fall to the ground to the front left of zone car 555. Officer McCue testified that he fired two shots at the suspect. A diagram of the scene was used by Officer McCue to indicate the direction the appellant ran. Officer McCue also left the witness stand to demonstrate the manner in which the appellant was fleeing, crouched down and walking backwards.
Officer Charles Davis testified that he and his partner that evening, Michael Butler, were in the zone car which pulled in directly behind Officers Potts and McCue. Officer Davis observed the appellant's vehicle drive up onto the sidewalk. As he was exiting his zone car, Davis saw Officer Costanzo approach the appellant's vehicle. Officer Davis heard someone yell 'gun' prior to hearing gun fire. He saw Officer Costanzo draw his weapon, and he then drew his, but Officer Potts stepped into his line of sight, so he fired no shots. Officer Davis dropped back around his zone car, saw Officer Butler shooting, but could not see around him. As he was moving back, Officer Davis saw Officer Cudnik rock twice, bounce over the trunk of his zone car, and fall on the ground. Officer Davis estimated that five seconds elapsed between the time of the first and the last gunshot (T. 1512, 1515).
Officer Butler testified that when Officer Davis stopped their zone car, he bailed out because it was assumed that the appellant would flee the scene. Officer Butler stood on the southwest corner near Officer Potts. From this post, he was able to observe the appellant as he exited his vehicle. The appellant initially held the gun horizontally and then he began towards zone car 555. The following testimony was elicited from Officer Butler:
 Q. And as you're looking at the vehicle, when is the first time you see the Defendant?
A. When he steps out of the car.
Q. Okay. Describe what you see.
 A. At that time I see the Defendant step out of the vehicle. I could see the gun in his hand. And then he begins to run towards triple five, zone car triple five.
Q. Okay. How is he holding the gun?
A. Pretty much almost horizontal position.
* * *
 Q. Okay. And can you show — demonstrate for the jury, if you would step down here, how he was holding this gun when you saw him going across the street?
 A. When he come out of the car, he had it like this, and when he turned, he was running towards the zone car like this, at which time I could perceive there was an officer in that view out of the corner of my eye, at which time I opened up fire on the suspect.
 Defense Counsel: Your Honor, may the record show the manner in which he's holding that shotgun at the moment?
The Court: Right.
 Prosecutor: When you're indicating he's holding the gun like this, he's holding it in front of him with the gun pointed forward?
 Defense Counsel: want him to hold it like he was holding it.
 Witness: When he cleared the car, it was not quite a coat of arms but level.
 The Court: Officer, think for a second that you are reading a book. If you are reading a book, give us a description of what you are doing.
Witness: Okay.
The Court: If somebody were reading a book, okay?
Prosecutor:
Q. Where are your hands, and —
 A. His hands was definitely down holding the stock of the barrel right here where my hands are, and he had his other hand straight down on the neck, and at which time, you know, he left the concealment of his vehicle.
* * *
 A. Okay. When I saw him come out of the car, I could see the top of his head and the top of this barrel.
The Court: Where was the barrel pointing?
 The Witness: At that time it wasn't up when he come out of the car.
The Court: Did that position change?
The Witness: It changed.
The Court: Please describe it.
 The Witness: As soon as he stepped away from the top of the hood of the vehicle, it changed, it went straight to down.
Prosecutor:
Q. Which way was the gun pointed at that time?
 A. Straight level, just like I have it now, in a horizontal position.
 Q. And towards what police car was that pointed at that time?
* * *
Q. Was the gun pointed at any police car?
A. Towards triple five.
 Q. Triple five, you're referring to Officer Cudnik and Officer Costanzo's car?
A. That's correct.
* * *
 Q. Approximately how may steps did he take towards the zone car?
A. Stepwise, a guesstimate it would be 15, 20.
(T. 1646 — 1651).
Officer Butler testified that he fired four shots at the appellant.
Officer Edwin Cooper was partnered with Officer Kenneth Vega that evening. The officers were assigned to zone car 512. When the appellant failed to make the turn onto East 77th Street, Officer Vega, the driver, pulled up behind zone car 555. Officer Cooper testified that the officers expected the appellant to flee. As they arrived at Carnegie, Officer Cooper testified that he heard a "God awful bang" (T. 1534), when the windshield of their zone car was struck. At this point he looked up and observed the appellant already out of his vehicle and holding an M-14 pointed towards himself and the zone car beside him, 555. Officer Cooper testified that the appellant was waiving the gun about (T. 1537). Officer Cooper observed the appellant walk quickly away without turning his back to the police.
Officer Vega testified that as he and his partner approached the area, the appellant already had the door of his vehicle open. He was not in a position to observe the appellant's feet, and did not see the shots fired at Officer Costanzo. Officer Vega put his zone car in park and prepared for a bail-out by the appellant. Officer Vega was already out of his zone car when he observed the appellant with a weapon pointed in his direction. He went into a prone crawl for protection while yelling 'gun' to his partner. Vega used State's exhibit 8-A to show the path he followed as he attempted to follow the appellant. He passed Officer Cudnik who was standing straight up. Since he was keeping his eyes on the appellant, he did not know whether or not Officer Cudnik had his weapon drawn. Officer Vega testified that fifteen to twenty seconds elapsed from the time of the first shot until the time of the last shot (T. 1605-1606).
Officers John Foster and David Wilsman arrived on the scene after the shooting ended. They assisted in placing Officer Cudnik in their zone car and then transported him to Mt. Sinai Hospital. Both officers testified that Officer Cudnik was alive, but unresponsive, during the drive to the hospital. The doctors, who had been given prior notification, were ready when Officer Cudnik arrived at the hospital, but were unable to save his life.
The appellant asserts two assignments of error through counsel, and one assignment of error pro se. This court will first address the errors assigned by counsel.
The first assignment of error set forth by counsel:
 ONE OF THE TWO ADDITIONAL THREE-YEAR MANDATORY TERMS FOR A FIREARM MUST BE VACATED WHEN THE MURDER AND ATTEMPTED MURDER WERE COMMITTED AS PART OF THE SAME TRANSACTION.
The appellant argues that the convictions arising from counts one and two of the indictment must be construed as being the same act or transaction and thus, pursuant to R.C.2929.14(D)(1)(a)(i), the court erred in imposing two consecutive mandatory sentences on the firearm specifications for the murder of Officer Cudnik and the attempted murder of Officer Costanzo.
R.C. 2929.14(D)(1)(a)(i) states
 * * * A court shall not impose more than one additional prison term on an offender under this division for felonies committed as part of the same at or transaction. * * *
This court, in both State v. Kaszas (September 10, 1998), Cuyahoga App. No. 72546 72547, unreported; and State v. Evans
(September 3, 1998), Cuyahoga App. No. 73018, unreported, held that the term "transaction" within the meaning of R.C.2929.71(B), the predecessor of R.C. 2929.14(D)(1)(a)(i), has been defined as "a series of continuous acts bound together by time, space and purpose, and directed toward a single objective." State v. Wills (1994), 69 Ohio St.3d 690, 691.
In the case sub judice, there was extensive use of exhibits while the officers were testifying. The unfortunate events of December 30, 1996, occurred rapidly and within a small area, with lights and sirens blaring. Each officer was in a different location and obviously had a different vantage point. Absent the ability to see where the Officers pointed to on the exhibits, this court has before it only the written record of the witnesses' words.
Officer Costanzo testified that the appellant, while still in his vehicle, aimed an assault rifle at him and opened fire. Officers McCue and Potts testified that the appellant exited the driver's side door. Officer Potts observed the appellant swinging the weapon around and pointing it in all directions (T. 1409). Officer McCue testified that after he saw Officer Costanzo approach the appellant's vehicle, saw the appellant's vehicle door kicked open, heard the shots fired at Officer Costanzo, and he observed the appellant exit his vehicle and point his weapon in the direction of Officer Cudnik's zone car (T. 1453). Partners Cooper and Vega each believed the appellant was pointing his weapon at their zone car (T. 1535, 1589). Additionally, Officer Cooper testified that the appellant was waiving his gun about. Officer Vega testified that fifteen to twenty seconds elapsed from the time of the first shot until the time of the last shot (T. 1605-1606).
Officer Davis stated that he was unable to see certain events as other officers were in his line of vision, but estimated that five seconds elapsed between the time of the first and the last gunshot (T. 1512, 1515). Officer Butler was questioned at length about his observations. He unequivocally testified that the appellant exited his vehicle with the weapon pointed upwards, then lowered the weapon to a horizontal position and affirmatively ran towards Officer Cudnik's zone car.
This court makes special note that at the sentencing, the court specifically found that the appellant had two objectives in mind, one to kill Officer Costanzo, and two, to kill Officer Cudnik. Thus the court imposed consecutive gun specifications on the appellant (T. 2703). The testimony of the officers is inconclusive on this issue, and since the trial court was in the best position to observe the physical re-enactments given by the police officers and was able to observe their testimony and use of maps and exhibits, this court concludes that the court did not err in finding that the appellant had two separate objectives and intended to kill two different men.
The appellant's first assignment of error set forth by counsel is not well taken.
The second assignment of error set forth by counsel:
 THE TRIAL COURT DENIED MR. HUGHES DUE PROCESS OF LAW GUARANTEED BY THE FIFTH AND FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTION 10 OF THE OHIO CONSTITUTION WHEN IT ORDERED HIM TO BE PLACED IN SOLITARY CONFINEMENT ON THE ANNIVERSARY DATE OF THE OFFENSES.
The appellant argues that the court exceeded its authority on ordering that the appellant be placed in solitary confinement on the anniversary date of his crimes. In support of this proposition, the appellant cites State v. Capone (July 20, 1995), Cuyahoga App. No. 67971, unreported; State v. Davis
(June 8, 1995), Cuyahoga App. No. 64270, unreported; State v.Dawson (Nov. 18, 1993), Cuyahoga App. No. 63122, unreported; and State v. Eberling (April 9, 1992), Cuyahoga App. Nos. 58559, 58560, unreported. The appellee raises no objection.
The appellant's second assignment of error raised by counsel is well taken.
The appellant's first assignment of error raised pro se:
 THE TRIAL COURT COMMITTED PLAIN ERROR BY CHANGING THE NAME AND IDENTITY OF THE OFFENSE CHARGED BY THE GRAND JURY IN VIOLATION OF CRIM.R. 7(D) ON THE SEVENTH DAY OF TRIAL AND DEFENDANT-APPELLANT WAS FOUND GUILTY OF THE AMENDED CHARGE OF MURDER, WHERE THE JURY WAS NOT INSTRUCTED ON THE LESSER OFFENSE OF AGGRAVATED MURDER THUS DEPRIVING THE APPELLANT OF EQUAL PROTECTION AND DUE PROCESS OF LAW GUARANTEED HIM UNDER THE FIFTH, SIXTH AND FOURTEENTH AMENDMENTS TO THE U.S. CONSTITUTION AND ARTICLE I SECTION 10 OF THE OHIO CONSTITUTION.
The appellant asserts the court amended the indictment in violation of Crim.R. 7 when it changed the name and identity of the offense. The appellant apparently contests the authority of the court to strike the prior calculation and design portion of the indictment on count two which reduced the charge of attempted aggravated murder to attempted murder.
This court has previously held that under Crim.R. 7(D), the original indictment can be amended during trial if the amendment charge is a lesser included offense of the original charge. State v. Briscoe (1992), 84 Ohio App.3d 569, 572, citing to State v. Deem (1988), 40 Ohio St.3d 205. Murder is a lesser included offense of aggravated murder. State v. Nemeth
(1998), 82 Ohio St.3d 202. Thus the appellant's pro se
assignment of error is without merit.
Judgment affirmed. Order sentencing appellant into solitary confinement on the anniversary date is vacated.
It is ordered that appellee recover of appellant its costs herein taxed.
The Court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this Court directing the Common Pleas Court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
JOHN T. PATTON, P.J., and KENNETH A. ROCCO, J., CONCUR.
 ____________________________ JAMES D. SWEENEY JUDGE
N.B. This entry is an announcement of the court's decision. See App.R. 22(B), 22(D) and 26(A); Loc.App.R. 27. This decision will be journalized and will become the judgment and order of the court pursuant to App.R. 22(E) unless a motion for reconsideration with supporting brief, per App.R. 26(A), is filed within ten (10) days of the announcement of the court's decision. The time period for review by the Supreme Court of Ohio shall begin to run upon the journalization of this court's announcement of decision by the clerk per App.R. 22(E). See, also, S.Ct.Prac.R. II, Section 2(A)(1).