DECISION.
In February 1999, plaintiffs-appellants, Lakeshore Properties, Universal Am-Cam, and C.C. Midwest (now known as Mason Dixon Trucking Center), filed a complaint against defendant-appellee city of Sharonville seeking a declaration of rights under the Sharonville Zoning Code. Arguing that a recent amendment to the zoning code could not be applied retroactively, particularly as it related to the storage of intermodal containers, the appellants not only asked the trial court to declare their rights under the new code, but they also challenged the code's constitutionality.
The city filed a counterclaim asserting that the stacking and storage of intermodal containers was an illegal extension of a nonconforming use and that the appellants had failed to acquire permission from the Sharonville Planning Commission to operate an intermodal storage facility. The city demanded that the trial court clarify the appellants' obligations concerning the storing and stacking of intermodal containers and enjoin them from storing and stacking such containers.
A bench trial was conducted on December 29, 1999. Stipulations by both parties and a copy of the applicable Sharonville Zoning Code were entered in the record. In addition, two experts testified at the trial. Michael Kenny testified on behalf of the appellants concerning his knowledge of intermodal transportation, including those operations relating to intermodal transportation performed by Mason Dixon Trucking Center (hereinafter "Mason Dixon"). C. Gregory Dale testified on behalf of the city concerning his knowledge of community planning and zoning, including the Sharonville Zoning Code. A report prepared by Dale was also entered in the record.
The record establishes that a trucking facility was operated at 1985 Crescentville Road, a site that had been zoned "general industrial" since 1960. In 1983, a new zoning category called "industrial truck center" was created. Under the 1983 amendments, "truck terminals" were removed from permitted uses in areas zoned "general industrial" and relegated to areas zoned "industrial truck center." Despite the amendments, the facility at Crescentville Road remained in a "general industrial" zone and continued its trucking operations as a preexisting nonconforming use.
In January 1994, the Crescentville site was abandoned. In June 1994, Universal Am-Can began operating a trucking facility on the southern portion of the property. It has been stipulated that Mason Dixon is the successor to Universal Am-Can. Approximately fifteen trucks are used by Mason Dixon to deliver loads with the aid of intermodal containers. According to Kenny, intermodal containers are boxes, typically made of steel, that are used to move freight. Kenny testified that intermodal containers are very flexible because they can be transported from a rail car or boat directly onto a tractor-trailer without being unloaded. Since 1997, the intermodal containers have been stacked at the facility with at least two containers in each stack. A repair business is also operated at the facility. It has been stipulated that Mason Dixon maintains separate accounts for its trucking company, its storage of intermodal containers, and its container maintenance.
In 1997, C.C. Midwest began using the main terminal building on the northern portion of the property for trucking purposes. It has been stipulated that this constitutes a legal nonconforming use of the property.
In 1998, the Sharonville Zoning Code was amended. The amendments pertinent to this case relate to the recognition of and the limitations placed on the storage of intermodal containers. Prior to the amendments, the Sharonville Zoning Code did not specifically recognize the intermodal container industry, probably because the commercial use of such containers use had only recently increased. Under the present version of Sharonville Zoning Code 1137.02(c), as it appears in the record, container ports may be used in areas zoned as a "industrial truck center," "pursuant to the regulations specified [in the zoning code] and only upon the approval as a conditional use." "Container" is defined as the following under Section 1137.10(b)(6) of the Sharonville Zoning Code:
 an article of transport equipment which is of a permanent character and strong enough for repeated use; is specially designed to facilitate the carriage of goods by one or more modes of transport, without intermediate reloading; and is fitted with devices permitting its ready handling from one mode of transport to another; and is so designed as to be easy to fill and empty; and has an internal volume of one cubic meter or more.
It is undisputed that the intermodal containers stored at the Mason Dixon facility met the definition of a container under the present Sharonville Zoning Code.
Following the trial, the court entered judgment in favor of the city. Among the findings relevant to this appeal were that the appellants' operation of a second trucking company, the storage of intermodal containers, and the repair of intermodal containers represented illegal extensions of a nonconforming use; that the operation of a second trucking company, the storage of intermodal containers, and the repair of intermodal containers represented impermissible separate, principal uses of the subject site; and that the storage of intermodal containers represented improper open-yard storage. Consequently, the court ordered the appellants to "immediately cease operation of its second trucking company, its intermodal container storage business and its intermodal container repair business[.]" The appellants now assert four assignments of error, none of which we find to be well taken.
In the first assignment of error, the appellants contend that the trial court erred by permitting the city's expert, Dale, to testify that the Mason Dixon operation was a second principal use and an illegal extension of a nonconforming use. Specifically, the appellants maintain that Dale did not qualify as an expert because he did not satisfy the requirements of Evid.R. 702(B). Further, the appellants contend that Dale could not render an opinion as to whether the Mason Dixon facility was operating as a second principal use or as an illegal extension of nonconforming use, because Dale did not possess specialized training or expertise in the transportation or trucking industry. In response, the city contends that Dale was not a transportation expert, but rather a zoning expert. We agree.
The question before us is whether the trial court properly qualified Dale as an expert. The proper inquiry for determining whether Dale's testimony should have been admitted begins with Evid.R. 702. A witness may testify as an expert if (1) the testimony relates to matters beyond the knowledge or experience possessed by laypersons; (2) the witness possesses specialized knowledge, skill, experience, training, or education regarding the subject matter of the expert testimony; and (3) the testimony is based on reliable scientific, technical, or other specialized information.[1]
Upon review of the record, it is clear that Dale testified to a matter beyond the knowledge or experience possessed by laypersons pursuant to the first requirement under Evid.R. 702(A). Further, Dale offered sufficient evidence of his knowledge, training, education, and skill relating to community planning and zoning. For instance, Dale testified that he had earned a master's degree in community planning from the University of Cincinnati, and that he had approximately eighteen years' experience in community planning and zoning. Additionally, Dale testified that he had given numerous lectures in community planning and zoning; that he was a member of and held offices with various professional associations relating to planning; and that he had drafted land-use regulations, including zoning codes. Clearly these credentials qualified Dale as an expert pursuant to Evid.R. 702(B).
Finally, the record reveals that Dale offered specialized information relating to the appellants' compliance with the Sharonville Zoning Code. Therefore, we must determine whether that information was "reliable." Evid.R. 702 does not define "reliability;" therefore, its interpretation has been left to the development of caselaw.[2] The Ohio Supreme Court has stated that expert testimony based on "specialized knowledge" is admissible "if a person has information which has been acquired by experience, training or education which would assist the trier of fact in understanding the evidence or a fact in issue[.]"[3] With this standard in mind, Dale's testimony was sufficiently reliable because, through his zoning and planning experience, Dale had gained specialized knowledge about zoning laws and compliance with those laws, and his testimony was helpful for the trier of fact. Accordingly, we hold that the trial court did not abuse its discretion in qualifying Dale as an expert under Evid.R. 702, and we overrule the first assignment of error.
The appellants argue in the second assignment of error that the trial court erred by finding that the operations performed at the Mason Dixon facility, including the storage of intermodal containers, the operation of a second trucking company, and the repair business, represented separate principal uses. In the third assignment of error, the appellants maintain that the trial court erred in finding that the operations performed at the facility constituted extensions of a nonconforming use. In the fourth assignment of error, the appellants aver that the trial court erred by finding that the storage of intermodal containers represented outdoor storage under the zoning code. Because the three assignments of error essentially challenge the sufficiency and the weight of the evidence, we address them in the aggregate.
In C.E. Morris Co. v. Foley Constr. Co.,[4] the Ohio Supreme Court set out the standard to be applied when reviewing civil judgments on the manifest weight of the evidence. Where an appellant challenges a judgment as being against the manifest weight of the evidence in a civil case, the appellate court must examine the record to determine whether the judgment is supported by "competent, credible evidence going to all the essential elements of the case[.]"[5] But we note that this standard differs from the one set forth in State v. Thompkins.[6] InThompkins, the Ohio Supreme Court reviewed the standards to be applied when reviewing criminal cases on the manifest weight of the evidence. The court explained that the legal concepts of manifest weight and sufficiency are qualitatively and quantitatively different. To reverse a conviction for insufficient evidence, an appellate court must be persuaded, after viewing all of the evidence in the light most favorable to the prosecution, that no rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.[7]
To reverse on the weight of the evidence in a criminal case, the court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and conclude that, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created a manifest miscarriage of justice.[8] While the Thompkins standard is only applicable to the review of criminal cases, we note that the weight standard set forth in C.E. Morris Co. is much like the standard of review for sufficiency of the evidence set forth in Thompkins.[9] It appears, therefore, that in civil cases an appellate court is precluded from recognizing any qualitative or quantitative distinctions between the weight of the evidence and sufficiency of the evidence.[10] While this may be inconsistent with the standard we use in criminal appeals, we are nevertheless constrained by the holding set forth in C.E. Morris Co.
Given that, we first address whether the trial court erred in determining that the operations performed at the Mason Dixon facility represented separate principal uses. The appellants argue that the operations were permissible "accessory uses" of the property. The city, however, insists that this argument is unsupported by the record, because no one testified that the Mason Dixon operations were accessory to the primary trucking operations of C.C. Midwest. Further, the city maintains that the record establishes that the operations performed at the Mason Dixon facility were separate from those of C.C. Midwest. We agree.
"Accessory use" is defined under Sharonville Zoning Code 1123.01 as "any use or structure subordinate to the principal use of a building on the same lot and serving a purpose customarily incidental to the use of the principal building." Dale testified that, based on his expertise relating to zoning compliance and his observations of the operations performed at the Crescentville property, the operations performed by Mason Dixon constituted a second principal use of the property. In his report, Dale determined that the use of the intermodal containers was not incidental to the use of the truck terminal by C.C. Midwest, because there was no interaction between the use of the intermodal containers and the use of C.C. Midwest's trucking facility. Dale based his opinion on his interpretation of the Sharonville Zoning Code and his observations at the property, specifically the fact that there were two signs located on the Crescentville property that identified one trucking facility run by C.C. Midwest and one container yard run by Mason Dixon, and the fact that separate record books were kept for the operations performed by Mason Dixon. While Kenny testified that the intermodal containers stored at the property were a part of Mason Dixon's business and that it was not unusual to store intermodal containers or to have a repair facility located at a truck center, his testimony fell short of addressing whether the operations performed by Mason Dixon were in fact incidental to the use of the principal building, which was operated by C.C. Midwest. Given that, we hold that Dale's testimony and report provided competent and credible evidence that the storage of intermodal containers, the second trucking business, and the repair facility were second principal uses under the zoning code.
Next we address the appellants' argument that the operations at Mason Dixon's facility did not constitute an illegal extension of a nonconforming use. Basically, the appellants maintain that an increase in the volume of business, by itself, does not constitute an unlawful extension of a nonconforming use under the Sharonville Zoning Code. In response, the city argues that the question in this case does not involve whether there was an increase in the volume of business, but whether the three businesses performed by Mason Dixon without the permission of the local zoning board were extensions that constituted illegal nonconforming uses.
The Sharonville Zoning Code provides in relevant part the following relating to nonconforming uses:
 1155.02 LAWFUL NONCONFORMANCE The lawful use of any dwelling, building or structure and of any land or premises as existing and lawful at the time of enacting this Zoning Ordinance, may be continued, although such use does not conform to the provisions of the Ordinance. The completion, restoration, reconstruction, extension or substitution of nonconforming uses shall be subject to the provisions and conditions set forth in this chapter. * * *
 1155.06 EXTENSION PROHIBITED Any nonconforming building shall not be enlarged or structurally altered except to make it a conforming building. A nonconforming residentail [sic] building may, however, be enlarged in accordance with the provision of Section 1155.04. A nonconforming use may not be extended within a building, enlarged or added to in any manner, except that nonconforming uses and buildings may be improved by a conditional use permit granted under the provisions of Section 1159.01(c). * * *
 In sum, the code provides that a nonconforming use may not be extended, enlarged, or added to in any manner, unless the building is enlarged pursuant to Section 1155.04 of the zoning code, or unless a conditional permit is obtained to make improvements to the use of the property or the building pursuant to Section 1159.01(c).
Having reviewed the record, we conclude that Section 1155.04 is clearly inapplicable here, as the Mason Dixon building was not residential. Further, no evidence was presented that Mason Dixon applied for or received a conditional-use permit to make improvements to the property under Section 1159.01(c). Finally, there is no evidence that there was an attempt to the make the building a conforming one. Therefore, the only issue here is whether Mason Dixon's use of the property for the operation of a second trucking company using intermodal containers, the storage of intermodal containers, and the operation of a repair facility for intermodal containers extended, enlarged, or added to the use of the property in any manner.
Kenny testified that the nature and character of Mason Dixon's operations involved the use of the property as a trucking facility. Dale presented contrary testimony. He maintained that the addition of the intermodal storage facility by Mason Dixon "clearly enlarged, or at the very least, added to the existing nonconforming use." Moreover, Dale's report opined the following:
 Because the intermodal containers, now situated at the UAC [Universal Am-Cam] property, were not present when the trucking terminal became a nonconforming use, they then became an extension of an existing nonconforming use when they were placed on the property.
 We note that the credibility afforded to an expert's opinion remains for the trier of fact.[11] Given that, we hold that competent and credible evidence was presented that the existing nonconforming use of the trucking facility was enlarged by adding Mason Dixon's three operations relating to intermodal containers. Under these circumstances, we conclude that the trial court did not err in determining that the Mason Dixon operations, including its trucking facility, its storage of intermodal containers, and its repair facility, constituted an unlawful extension of a nonconforming use.
Finally, we address the appellants' argument relating to the storage of intermodal containers. The appellants suggest that, because an intermodal container is not a product under the definition in Sharonville Zoning Code 1137.02(b), the storage of such containers on the property did not represent outdoor storage. The city's response is that while Dale's testimony supported the trial court's finding, the appellants failed to present evidence relating to this issue. Consequently, the city maintains that competent and credible evidence was presented to support the trial court's finding that the storage of intermodal containers constituted outdoor storage.
Sharonville Zoning Code 1137.02(b)(3) provides that, in areas zoned "general industrial," land or property may be used for, among other things,
 industrial processes and uses, such as: * * * (C) Storage and distribution of products within an enclosed building including assembly, repackaging and relabeling of such products, or any associated office use.
 Dale's opinion was that the Sharonville Zoning Code required that products be kept within an enclosed building in a "general industrial" area. Viewing the intermodal containers as products and having observed the intermodal containers being stacked outside the Mason Dixon facility, Dale opined that the appellants were required either to obtain the approval of the Sharonville Zoning Board or to acquire a conditional-use permit before stacking the containers outside. As no evidence was presented to the contrary, we conclude that competent and credible evidence was presented to support the trial court's finding in this respect.
In sum, having found that competent and credible evidence was presented to support all the trial court's pertinent findings, we overrule the second, third, and fourth assignments of error. Moreover, even if we were to apply the standard outlined in Thompkins relating to the weight of the evidence, we would conclude that the evidence does not weigh heavily against the trial court's judgment or that a manifest miscarriage of justice has occurred. This is not an exceptional case where the evidence weighs heavily against the trial court's findings. Accordingly, we overrule the four assignments of error and affirm the judgment of the trial court.
Hildebrandt, P.J., Gorman and Sundermann, JJ.
[1] See Evid.R. 702(A)-(C).
[2] See State v. Nemeth (1998), 82 Ohio St.3d 202, 209-210,694 N.E.2d 1332, 1337-1338.
[3] State v. Stowers (1998), 81 Ohio St.3d 260, 262, 690 N.E.2d 881,883.
[4] (1978), 54 Ohio St.2d 279, 376 N.E.2d 578.
[5] Id. at syllabus.
[6] (1997), 78 Ohio St.3d 380, 678 N.E.2d 541.
[7] See State v. Thompkins, supra, at 386, 678 N.E.2d at 546.
[8] See id. at 387, 678 N.E.2d at 546-547.
[9] Accord Reed v. Key-Chrysler Plymouth, 125 Ohio App.3d 437, 440,708 N.E.2d 1021, 1023; Siegal v. Magic Carpet Upholstery (Aug. 12, 1999), Cuyahoga App. No. 74645, unreported.
[10] See Reed v. Key-Chrysler Plymouth, supra.
[11] See State v. Nemeth, supra, at 210, 694 N.E.2d at 1338.