OPINION
{¶ 1} On August 10, 2001, Michael W. Ross was indicted on charges of murder, felonious assault, involuntary manslaughter, and two counts of endangering children. He was accused of causing the death of his infant daughter, Madison Ross. He entered pleas of "not guilty" to all charges.
 {¶ 2} Mr. Ross was able to hire his own lawyer, who pursued pretrial discovery on his behalf. His lawyer also obtained the assistance of a psychologist, Jolie Brams, Ph.D., and prepared to present evidence at trial that Madison's older brother, Joel Ross, was the individual who was responsible for Madison's injuries.
 {¶ 3} A jury trial commenced on May 13, 2002. The jury found Mr. Ross not guilty of the murder charge but guilty of the remaining charges.
 {¶ 4} With the help of new counsel, Michael Ross ("appellant") has pursued a direct appeal, assigning seven errors for our consideration:
 {¶ 5} "Assignment Of Error No. I:
 {¶ 6} "Appellant Was Denied The Effective Assistance Of Counsel As Guaranteed By The State And Federal Constitutions.
 {¶ 7} "Assignment Of Error No. II:
 {¶ 8} "Appellant's Right To Defend Himself Against The Accusations Of The State And To Present Witnesses Was Denied By The Trial Court['s] Order Preventing Expert Testimony From Dr. Jolie Brams In Violation Of The Fifth, Sixth, Eighth And Fourteenth Amendments [to] The United States Constitution And Article I, Section[s] 2, 10 16 Of The Ohio Constitution.
 {¶ 9} "Assignment Of Error No. III:
 {¶ 10} "The Trial Court Erred In Refusing To Allow Evidence Of Statements Of Joel Ross Indicating His Fear That He Caused His Sister's Death And That He Swung The Victim By Her Ankles On The Night Of The Injury. Precluding This Evidence Denied Appellant His Rights To Present A Defense, His Rights To A Fair Trial, Due Process And The Effective Assistance Of Counsel Under The Federal And State Constitutions.
 {¶ 11} "Assignment Of Error No. IV:
 {¶ 12} "The Trial Court Erred In Refusing To Permit Defense Counsel A Full Opportunity To Cross-examine The State's Witness In Violation Of The Fifth, Sixth, Eighth And Fourteenth Amendments To The United States Constitution And Article I, Sections 2, 10 16 Of The Ohio Constitution And Ohio Evidence Rules.
 {¶ 13} "ASSIGNMENT OF ERROR NO. V:
 {¶ 14} "A Defendant Is Denied His Rights To A Fair Trial, Due Process And A Reliable Determination Of His Guilt And Sentence As Guaranteed By The Fifth, Sixth, Eighth And Fourteenth Amendments To The United States Constitution And Article I, Sections 10 And 16 Of The Ohio Constitution When The Prosecutor Repeatedly Engages In Improper Argument And Other Misconduct.
 {¶ 15} "Assignment Of Error No. VI:
 {¶ 16} "Appellant's Right To Defend Himself Against The Accusations Of The State And To Present Witnesses Was Denied By The Trial Court['s] Order Preventing Expert Testimony From Dr. George Mass. In Violation Of The Fifth, Sixth, Eighth And Fourteenth Amendments [to] The United States Constitution And Article I, Section[s] 2, 10 16 Of The Ohio Constitution.
 {¶ 17} "Assignment Of Error No. VII:
 {¶ 18} "A Conviction Must Be Reversed When The Cumulative Effect Of Errors Deprives A Defendant Of His State And Federal Constitutional Right To A Fair Trial."
 {¶ 19} Madison Ross was born June 20, 2001. Less than six weeks later, she was dead as a result of a blow to the head. She suffered the blow while at her home, with only her father and her five-year-old brother present. The baby had a bruise on her arm and a bruise behind her ear when she was seen at the hospital emergency room.
 {¶ 20} Appellant denied harming his infant daughter. The child's mother, Shelli Ross, did not believe that her husband had harmed the child. Shelli also claimed that five-year-old Joel made statements and asked questions which could be construed to imply that Joel felt somehow responsible for Madison's death. The key issue at trial was whether testimony could be placed before the jury which supported a theory that Joel had accidentally harmed his little sister.
 {¶ 21} Joel Ross was not a typical five-year-old. At trial, he was described by his mother as already being over three feet tall and weighing 80 pounds. Shelli Ross also described her son as a "very hyper, very show-off, just very active little boy," who liked to pick up his baby sister a lot. (Tr. 136.) Joel displayed poor impulse control and tended to use his height and weight to bully other children. He later was given self-anger management at school while in kindergarten.
 {¶ 22} We first address the third assignment of error.
 {¶ 23} When Shelli Ross testified as a state's witness at trial, defense counsel attempted to elicit statements made by Joel which related to Madison's death. Defense counsel argued that the statements were "excited utterances" for purposes of Evid.R. 803(2) and, therefore, admissible as evidence. The trial judge disagreed and kept the testimony from the jury.
 {¶ 24} Four separate incidents were presented to the trial judge as occasions when Joel spoke about his sister ("Maddie") and her death. The first incident occurred within a week of Madison's death when Joel, his mother, and an aunt named Megan Weber were in a car together. Joel was recalled by Megan Weber as saying, "The night that you guys were out of town, we were listening to music and I picked Maddie up by her feet and was dancing with her."
 {¶ 25} The second incident occurred about one week later when Joel was again with his aunt. Joel asked his aunt if he made Maddie "go to heaven." No one but the aunt was physically present when this question was asked.
 {¶ 26} In a third incident, Joel was talking to his mother about two weeks after his father was arrested on the charges involving Madison's death. Joel told his mother that he missed his sister. He said that they used to play a lot and that one time, he was swinging her by her ankles. He then demonstrated how he had dangled her by her ankles.
 {¶ 27} The fourth incident occurred in the fall of the same year. Joel told his mother that he missed Maddie. He then asked, "Did I make her go to the angels?" Shelli Ross asked her son why he thought that and Joel responded, "Because I was spinning her around the room."
 {¶ 28} We note initially that only an assertion or a nonverbal act which is intended as an assertion can be a "statement" for purposes of the evidence rules regarding hearsay. See Evid.R. 801(A). Questions which do not involve an assertion cannot be hearsay statements. Instead, questions are a form of verbal act which must be considered for admissibility based upon other criteria, including relevancy.
 {¶ 29} The fact that a five- or six-year-old child would wonder if he or she was responsible for the death of an infant sibling is not relevant in and of itself. The relevance of the child's inquiry becomes apparent only in the context of the child's other assertions about what happened or in the context of other relevant evidence.
 {¶ 30} No one asserts that Joel Ross was competent to testify himself. Thus, the analysis of whether or not his other verbal utterances should be admitted are subject to analyses under Evid.R. 803 (Hearsay Exceptions; Availability of Declarant Immaterial) and Evid.R. 804 (Hearsay Exceptions; Declarant Unavailable).
 {¶ 31} As noted above, appellant's trial counsel argued that Joel's questions and statements should be admissible under Evid.R. 803(2), the hearsay exception regarding "excited utterances." Evid.R. 803(2) reads:
 {¶ 32} "The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
 {¶ 33} "* * *
 {¶ 34} "A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition."
 {¶ 35} This paragraph does not apply in the instant case because no evidence indicated that Joel was "under the stress of excitement" of his sister's death when he spoke to his mother or when he spoke with his aunt. Instead, he was trying to make sense of the death, express his grief over the loss of his sister, and figure out if he was to some degree responsible. Nothing indicated that he was excited when he spoke.
 {¶ 36} When the trial judge excluded the statements, the judge stated:
 {¶ 37} "* * * Obviously, these statements are not the incident. There's no incident that's connected with these statements. You're talking about two weeks, two months — — actually in excess of two months.
 {¶ 38} "A spontaneous declaration is supposed to take place without the opportunity to reflect and to go through a process or be influenced by other people that may be around the person. That's where there's an indicia of reliability of the statements and that's why it's an exception to the Hearsay Rule.
 {¶ 39} "Obviously, Joel was in the care and custody of the individual who is in the belief that her husband did not commit this crime, which is a proper belief, but the only other person that could have committed the crime is Joel, and if, in fact, any of the testimony of the doctors are believed. So denying that her husband could commit the crime and being exposed to the child, obviously she believes probably did commit the crime, makes the indicia reliability less reliable, especially as time goes by.
 {¶ 40} "So the court will not admit any of the statements that have been produced to the court at this point in time. * * *" (Tr. 381-382.)
 {¶ 41} The trial court, in excluding the evidence, apparently also considered Evid.R. 803(1), which allows testimony about a declarant's "present sense impression":
 {¶ 42} "A statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter unless circumstances indicate lack of trustworthiness."
 {¶ 43} Evid.R. 803(1) also does not apply because Joel was not still perceiving the "event or condition" of dangling or swinging his sister nor had the event occurred so recently as to be deemed "immediately thereafter."
 {¶ 44} Counsel on appeal argues two additional hearsay exceptions which were not considered by the trial court, Evid.R. 803(3) and Evid.R. 804(B)(3).
 {¶ 45} Evid.R. 803(3) describes the "then existing, mental, emotional, or physical condition" hearsay exception, as follows:
 {¶ 46} "A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will."
 {¶ 47} The "then existing state of mind" is guilt or fear in Joel. However, the statement is not Joel saying, "I feel afraid" or "I feel guilty." The statements which trial counsel attempted to place before the jury were statements flowing from Joel's feelings, not statements of the feelings or emotions. Further, the statements were statements of Joel's memory, explicitly excluded under the rule.
 {¶ 48} Evid.R. 804(B)(3) reads, in pertinent part:
 {¶ 49} "The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:
 {¶ 50} "* * *
 {¶ 51} "(3) Statement against interest. A statement that was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability, or to render invalid a claim by the declarant against another, that a reasonable person in the declarant's position would not have made the statement unless the declarant believed it to be true. A statement tending to expose the declarant to criminal liability, whether offered to exculpate or inculpate the accused, is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement."
 {¶ 52} Appellate counsel argues that Joel was risking his relationship with his mother, so his statements and questions were statements against interest. We reject this argument because the record does not demonstrate that Joel, as a five- or six-year-old, was developed mentally to the point that he could appreciate such concepts as pecuniary interest, proprietary interest, or criminal liability. Since he could not comprehend these concepts, he could not speak about them in a way that would only be true because he had to know he was placing his money or freedom at risk.
 {¶ 53} Because of the difficulties in getting the statements of young children admitted into evidence, the Ohio Rules of Evidence were amended in 1991 to allow the statements of children to be admitted in cases where the children were alleged to be abused, either physically or sexually. Evid.R. 807 allows the statements of children under age 12 to be admitted to describe sexual acts involving the children or acts of physical violence directed against the children. Evid.R. 807 does not apply to Joel Ross's situation.
 {¶ 54} The trial court ruled in accord with the Ohio Rules of Evidence in excluding Joel's statements as proffered by Joel's mother and aunt.
 {¶ 55} The third assignment of error is overruled.
 {¶ 56} We turn next to the second assignment of error, in which appellant argues that the trial court erred in refusing to allow defense counsel to present the expert testimony of a psychologist.
 {¶ 57} Trial counsel attempted to place information about Joel Ross before the jury through the testimony of Jolie Brams, Ph.D. At a hearing in March of 2002, approximately two months before trial, defense counsel explained his intentions in calling Dr. Brams to the witness stand. The trial judge initially was concerned that Dr. Brams was being called to testify that appellant did not abuse his daughter, Madison. The judge was not willing to admit such testimony into evidence or to allow testimony about child abuse generally. Defense counsel did not suggest at that time that Dr. Brams would testify about Joel Ross or attributes of children who suffer from attention deficit or hyperactivity.
 {¶ 58} On the first day of trial, defense counsel presented the court with a report from Dr. Brams which addressed two sets of issues. The first issue was the competency of Joel Ross to testify in court. The second set of issues involved the symptoms and attributes displayed by Joel Ross when he was observed by and interviewed by Dr. Brams. She wrote:
 {¶ 59} "* * *
 {¶ 60} "2. Joel Ross presents with significant signs and symptoms of attention deficit disorder with hyperactivity. Indeed, in my more than twenty years of clinical practice with children, I have rarely seen a child this motorically hyperactive. Joel is an exceedingly impulsive young man, who literally cannot sit still and/or focus on even a pleasurable task for more than a minute or two. He is also extremely physically active, very rough both with play materials as well as intruding on interpersonal space and becoming physically inappropriate with adults as well as children. Not only does the history provided, by family members as well as records, document this disorder, but my own observations of Joel clearly corroborate their concerns. For example, he pinched and pulled hair on my arms so quickly that his behavior could not be controlled and in addition, although not intentionally, he kicked me several times during this evaluation as I was trying to control his motoric behavior. His large build makes his deficits in controlling his actions ever more problematic.
 {¶ 61} "3. It is further my opinion that this condition has been chronic and has existed likely since infancy or toddlerhood. This conclusion is based on the history generated by both mother and grandmother, supplemental documentation, as well as my own professional knowledge of the course and presentation of attention deficit hyperactivity disorder." (Joint Ex. 1/Defense Proffer Ex. A.)
 {¶ 62} Defense counsel explained his reasoning in calling Dr. Brams to the witness stand as supporting an alternative explanation for the source of the injuries suffered by Madison Ross. The trial judge allowed counsel time to further research the admissibility of such evidence but subsequently barred the testimony from being discussed in opening statements or presented at trial, viewing the testimony as inadmissible propensity and character evidence.
 {¶ 63} The testimony at trial indicated that appellant called 911 at 3:27 a.m., saying that his daughter was not breathing. Testimony from Deputy Coroner Keith Norton, M.D., indicated that the child died from trauma to her head which had occurred no more than twelve hours before, but probably within two hours of her death. When clearly asked about the testimony he gave about the trauma to the baby's head being within two hours of the child's death, Dr. Norton stated that the two-hour time limit could not be stated to a reasonable medical certainty. The twelve-hour outer limit for the time between the trauma and death was based upon Dr. Norton's review of microscopic slides taken at the autopsy.
 {¶ 64} If the twelve-hour limit is applied, testimony from appellant at trial indicated that he left the baby unattended with Joel Ross for extended periods of time while appellant worked on hardware for a screen door and back door. Appellant also testified that the baby had been moved on two of the occasions when he took a break from his work on the house. Since Madison could not move herself, Joel had to have moved the baby if appellant's testimony is to be believed.
 {¶ 65} At trial, defense counsel indicated that his purpose in calling Dr. Brams to testify was to place before the jury information regarding attention deficit hyperactivity disorder in general and the doctor's diagnosis and observations of Joel Ross in particular.
 {¶ 66} Evid.R. 402 provides generally that all "relevant" evidence, with numerous exceptions, is admissible. Evid.R. 401 defines "relevant evidence" as that "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."
 {¶ 67} A well-established exception to the general rule of admissibility is set forth in Evid.R. 404, that upon which the trial court relied in deeming Dr. Brams' testimony inadmissible, which speaks to "character" or "propensity" evidence, in relevant part, as follows:
 {¶ 68} "(A) Evidence of a person's character or a trait of his character is not admissible for the purpose of proving that he acted in conformity therewith on a particular occasion * * *.
 {¶ 69} "* * *
 {¶ 70} "(B) Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." (Emphasis added.)
 {¶ 71} In addition to the requirement of relevancy, expert testimony must meet the criteria of Evid.R. 702. In State v. Nemeth (1998), 82 Ohio St.3d 202 at 208, the Ohio Supreme Court set forth the requirements of the rule:
 {¶ 72} "* * * [Evid.R.] 702 provides that a witness may testify as an expert if all of the following apply:
 {¶ 73} "(A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;
 {¶ 74} "(B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony;
 {¶ 75} "(C) The witness' testimony is based on reliable scientific, technical, or other specialized information. * * *"
 {¶ 76} In Nemeth, the court addressed expert testimony in the context of a 16-year-old defendant convicted of murder. The defendant claimed to be the victim of child abuse at the hands of the decedent. In allowing expert testimony regarding child abuse both in general and as to Nemeth in particular, the court emphasized that admissibility of evidence should be favored in order to assist the trier of fact, stating:
 {¶ 77} "Evidence that would support a defendant's explanation of the events at issue and would provide evidence as to his possible state of mind at the time of the incident is clearly relevant to his or her defense." Id. at 207.
 {¶ 78} Not only was Dr. Brams' proffered testimony relevant, her expert opinion was clearly admissible under the above-emphasized "other acts" exceptions. As proffered, her testimony was not offered to prove Joel's "character" but, instead, was offered to prove or corroborate the very heart of appellant's defense, including such potentially critical facts as motive, opportunity, intent, knowledge, and identity. In addition, her testimony satisfies the Evid.R. 702 criteria set forth in Nemeth.
 {¶ 79} Under the circumstances in the instant case, the jury — as trier of fact — should have been afforded the opportunity to know more about the attributes of the child who spent a significant amount of time with Madison and who apparently moved the child around the room. The testimony of Dr. Brams should have been permitted.
 {¶ 80} The second assignment of error is sustained.
 {¶ 81} By his fourth assignment of error, appellant contends that the trial court erred in refusing to permit defense counsel a "full opportunity" to cross-examine Dr. Keith Norton, the deputy coroner.
 {¶ 82} Because Joel Ross went to sleep at approximately midnight, the time between the death of Madison and the blow to her head was particularly significant. Although Dr. Norton eventually acknowledged that he could not say with reasonable medical certainty that the blow occurred less than two hours before the death, he asserted that such a time frame was "probably" involved and made the concession about "probably" only on cross-examination after stating with greater assurance on direct examination that only minutes passed between the blow and the baby's death. Under the circumstances, a complete cross-examination was necessary if the jury was to have the opportunity to properly evaluate the weight to be given Dr. Norton's testimony.
 {¶ 83} The trial judge repeatedly limited cross-examination of Dr. Norton, especially with regard to questions about whether Dr. Norton's testimony agreed or conflicted with authoritative sources such as the Journal of the American Medical Association ("JAMA").[1] The trial court incorrectly applied Evid.R. 706, which reads, in pertinent part:
 {¶ 84} "Statements contained in published treatises, periodicals, or pamphlets on a subject of * * * medicine, or other science or art are admissible for impeachment if the publication is either of the following:
 {¶ 85} "(A) Relied upon by an expert witness in reaching an opinion;
 {¶ 86} "(B) Established as reliable authority (1) by the testimony or admission of the witness, (2) by other expert testimony, or (3) by judicial notice."
 {¶ 87} Trial counsel attempted to impeach Dr. Norton's direct testimony with articles, including those from JAMA, as well as other written materials, regarding such phenomena as "battering children syndrome" and related concepts such as siblings causing injuries to infant siblings. In fact, the doctor stated that he had provided defense counsel the materials in question to assist counsel in reviewing the medical and forensic information provided via the coroner's report. The trial court immediately stopped such questioning during counsel's foundational questioning regarding the doctor's familiarity with the JAMA materials.
 {¶ 88} In precluding defense counsel from asking questions based upon JAMA and other authoritative sources, the trial court stated:
 {¶ 89} "We are not going to do that. We are not in the federal court system so we don't have treatise exception and I'm not going to permit you to do that." (Tr. 273; emphasis added.)
 {¶ 90} While such a conclusion might have been proper years ago, the Ohio Rules of Evidence adopted the "learned treatises" rule, Evid.R. 706 set forth above, effective July 1, 1998. "Evid.R. 706 codified Ohio's common law rule allowing the use of learned treatises for the limited purpose of impeachment." State v. Samatar (2003), 152 Ohio App.3d 311,2003-Ohio-1639 at ¶ 45, citing Freshwater v. Scheidt (1999),86 Ohio St.3d 260.
 {¶ 91} The trial court erred in its limitation of the cross-examination of Dr. Norton.
 {¶ 92} The fourth assignment of error is sustained.
 {¶ 93} Based upon our disposition of the second and fourth assignments of error and the resulting necessity of a new trial, we deem the first, fifth, sixth and seventh assignments of error moot.
 {¶ 94} In summary, the third assignment of error is overruled, and the first, fifth, sixth and seventh assignments of error are moot. Having sustained the second and fourth assignments of error, the judgment of the trial court is reversed and this case is remanded for further proceedings consistent with this opinion.
Judgment reversed and case remanded.
TYACK, J., BRYANT, J., and PETREE, P.J., concur.
[1] The record reveals that the trial court eventually discovered its erroneous ruling regarding Ohio's Evid.R. 706. However, in reviewing the transcript, the court's subsequent discovery came too late and was likely prejudicial. Following the court's initial treatment of defense counsel's attempt to impeach the doctor's credibility, the jury was left with the notion that defense counsel's impeachment attempts were baseless and without merit.