OPINION
{¶ 1} This appeal is brought by the State from a judgment of the Juvenile Court that denied Montgomery County Children's Services (MCCS) motion for permanent custody of Luke Priser and ordered that Luke be placed in a planned permanent living arrangement.
 {¶ 2} Luke Priser, the son of Teddy and Teresa Priser, was born on September 24, 1991. He was eleven years old at the time of the hearing on MCCS's motion.
 {¶ 3} Luke has been diagnosed with several mental disorders including Reactive Attachment Disorder, Attention Deficit Hyperactive Disorder, and Post Traumatic Stress Disorder. As a result of these mental and emotional disorders, Luke distrusts everyone and has significant special care needs. Luke experiences behavioral problems at home and in school, which include anger and aggressiveness, acting out, manipulative behavior, lying, stealing, an inability to concentrate in school, and nightmares.
 {¶ 4} In May 1997 Luke's mother voluntarily placed him in the care of MCCS, where he has remained since. While in the care of MCCS, Luke has lived with his current foster family, Mike and Pat Provost. Luke has received mental health counseling since December of 1999.
 {¶ 5} On August 14, 1997, MCCS filed a complaint alleging that Luke is a dependent child. On October 7, 1997, the Juvenile Court adjudicated Luke a dependent child and granted MCCS temporary custody of Luke.
 {¶ 6} On July 1, 1999, MCCS filed a motion seeking permanent custody of Luke. Hearings were held on December 9 and 16, 1999. On January 13, 2000, the court overruled the request for permanent custody and placed Luke into a planned permanent living arrangement.
 {¶ 7} On April 5, 2000, MCCS filed another motion requesting permanent custody of Luke. A hearing was held on October 26, 2000. At that hearing Luke's mental health counselor, Helen Nemeth, was permitted to testify as an expert witness in Reactive Attachment Disorder, over the objections of the mother that Ms. Nemeth lacked the necessary expertise.
 {¶ 8} Ms. Nemeth testified regarding Luke's mental health issues and the therapeutic progress Luke made while with his foster family. She also testified that Luke's current foster family was the best placement for him at this time. On November 9, 2000, the trial court overruled the request by MCCS for permanent custody of Luke, and continued Luke in the planned permanent living arrangement.
 {¶ 9} On July 5, 2002, MCCS once again filed a motion requesting permanent custody of Luke. A hearing was held on September 26, 2002, before a magistrate. At the hearing the State once again presented Helen Nemeth as an expert witness. As before, the mother objected to Nemeth's qualifications to testify as an expert in Reactive Attachment disorder. This time the trial court refused to qualify Nemeth as an expert witness, and would not permit her to offer an opinion as to what type of placement would be in Luke's best interest. The trial court did, however, allow Nemeth to testify to number of matters, including Luke's Reactive Attachment Disorder, her treatment of Luke, and his therapeutic progress.
 {¶ 10} On October 28, 2002, the magistrate issued his decision overruling the request by MCCS for permanent custody, and ordering Luke to remain in the planned permanent living arrangement with his current foster family.
 {¶ 11} MCCS timely filed objections to the magistrate's decision, raising the issues it now presents on appeal. On March 18, 2003, the trial court overruled the objections filed by MCCS and adopted the decision of its magistrate.
 {¶ 12} MCCS has now timely appealed to this court.
FIRST ASSIGNMENT OF ERROR
 {¶ 13} "THE TRIAL COURT ERRED WHEN IT REFUSED TO QUALIFY MS. NEMETH AS AN EXPERT WITNESS."
 {¶ 14} Evidentiary rulings are within the sound discretion of the trial court and its decision in such matters will not be disturbed on appeal absent an abuse of discretion. State v.Maupin (1975), 42 Ohio St.2d 473; State v. Sage (1987),31 Ohio St.3d 173. An abuse of discretion means more than a mere error of law or an error in judgment. It implies an arbitrary, unreasonable, unconscionable attitude on the part of the court.State v. Adams (1980), 62 Ohio St.2d 151.
 {¶ 15} At the permanent custody hearing held on September 26, 2002, the State offered Helen Nemeth, Luke's mental health counselor, as an expert in Reactive Attachment Disorder. Counsel for the mother objected that Ms. Nemeth lacked the qualifications necessary to testify as an expert in Reactive Attachment Disorder. The trial court agreed and refused to qualify Ms. Nemeth as an expert witness. The court nevertheless permitted Ms. Nemeth to testify about Luke's Reactive Attachment Disorder and her treatment of him for that condition. The State argues that the trial court abused its discretion in refusing to accept Ms. Nemeth as an expert witness.
 {¶ 16} Evid.R. 702 provides in relevant part:
 {¶ 17} "A witness may testify as an expert if all of the following apply:
 * * * {¶ 18} "(B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony."
 {¶ 19} A person has specialized knowledge if the person possesses information acquired by experience, training or education which would assist the trier of fact in understanding the evidence or a fact in issue. State v. Nemeth,82 Ohio St.3d 202, 211, 1998-Ohio-376. Whether a witness possesses specialized knowledge sufficient to be permitted to testify as an expert is a determination committed to the sound discretion of the trial court. State v. Dyson (October 27, 2000), Champaign App. No. 2000CA2.
 {¶ 20} Ms. Nemeth possessed sufficient specialized knowledge to testify as an expert about Reactive Attachment Disorder. Nemeth is a child mental health counselor who has a bachelor's degree in psychology and a master's degree in clinical counseling. Nemeth is licensed by the State of Ohio Social Worker and Counselor Board as a clinical counselor, and she is certified by the National Board of Counselors. Nemeth is a member of the American Counseling Association. In order to obtain her license, Nemeth was required to spend 4,000 hours on the job and to pass an examination. For her board certification, Nemeth had to obtain her master's degree and pass an exam.
 {¶ 21} Ms. Nemeth's licensure allows her to both diagnose and treat mental disorders in children, including Reactive Attachment Disorder. To keep her license current, Nemeth must acquire thirty continuing education credits each year, and one hundred credits every five years for her board certification. Nemeth has worked eleven years as a child mental health counselor, the past six and one-half years at Scioto Paint Valley Mental Health Center where she has worked with approximately ninety children who have Reactive Attachment Disorder.
 {¶ 22} Clearly, Ms. Nemeth possessed specialized knowledge about Reactive Attachment Disorder as a result of her education, training and experience. In refusing to accept Ms. Nemeth as an expert, the magistrate stated:
 {¶ 23} "THE COURT: Okay. Based upon the history of the case and based upon the testimony presented today the court is going to allow testimony but is not going to qualify as expert."
 {¶ 24} Two years earlier, at a permanent custody hearing held on October 26, 2000, when the State offered Helen Nemeth as an expert in Reactive Attachment Disorder, this same trial court accepted Nemeth as an expert on that occasion, over the same objection by the mother that Nemeth was not qualified to testify as an expert about Reactive Attachment Disorder. Given Nemeth's education, training and experience, and the fact that two years earlier this same court in this same case qualified Nemeth as an expert on this same subject, Reactive Attachment Disorder, we conclude that the trial court's refusal to accept Nemeth as an expert witness at the September 26, 2002, hearing was an abuse of discretion. Nevertheless, that error was harmless beyond a reasonable doubt.
 {¶ 25} Although the trial court did not accept Nemeth as an expert witness, it nevertheless permitted her to testify extensively about Luke's Reactive Attachment Disorder, his other mental disorders, her treatment of Luke, his therapeutic progress, the problems Luke will face in the future as a result of his mental disorders and special needs, and therapeutic concerns if Luke is adopted by a family other than his current foster parents. The only testimony Nemeth was precluded from offering on direct examination which the State proffered was her opinion that Luke would be better off for therapy purposes in an adoptive home rather than in his current planned permanent living arrangement with his foster family. That Nemeth held that opinion was made manifest, however, from other testimony she gave during cross and redirect examination.
 {¶ 26} We conclude that the trial court's error in refusing to qualify Nemeth as an expert witness was harmless to the extent that Nemeth expressed her views otherwise on the proper placement for Luke, and that the trial court was not obligated to afford any less credibility to that testimony simply because Nemeth testified as a lay witness and not an expert.
 {¶ 27} The first assignment of error is overruled.
SECOND ASSIGNMENT OF ERROR
 {¶ 28} "The trial court abused its discretion when it placed luke in a planned permanent living arrangement."
 {¶ 29} The court's option after a child is adjudicated dependent to place the child in a planned permanent living arrangement (PPLA), or long term foster care as it is known, is available in only three limited situations. See R.C.2151.353(A)(5)(a), (b), and (c). Subsections (b) and (c) are not applicable in this case. Thus, we focus on R.C.2151.353(A)(5)(a), which allows a PPLA placement if a public children's service agency requests that type of placement, if the court finds by clear and convincing evidence that a PPLA is in the best interest of the child, and:
 {¶ 30} "(a) The child, because of physical, mental, or psychological problems or needs, is unable to function in a family-like setting and must remain in residential or institutional care."
 {¶ 31} We have previously held that the court may, sua sponte, consider the option of a PPLA even when the agency did not request it. See: In re Lane (February 9, 2001), Montgomery App. No. 18467.
 Best Interest of the Child {¶ 32} The State argues that the record does not contain clear and convincing evidence to support the trial court's conclusion that placement in a PPLA is in Luke's best interest. We disagree.
 {¶ 33} A trial court's decision concerning child custody matters rests within its sound discretion. Miller v. Miller
(1988), 37 Ohio St.3d 71, 74. See, also, In re Beal (Oct. 5, 1992), Clark App. No. 2903, unreported. Nevertheless, "[w]hile the trial court's discretion in a custody proceeding is broad, it is not absolute, and must be guided by the language of the relevant statute." In re Beal, supra. "The term `abuse of discretion' connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable." Blakemore v. Blakemore (1983),5 Ohio St.3d 217, 219.
 {¶ 34} "Clear and convincing evidence is that level of proof which would cause the trier of fact to develop a firm belief or conviction as to the facts sought to be proven." In re Dylan C.
(1997), 121 Ohio App.3d 115, 121. (Citation omitted.) "An appellate court will not reverse a trial court's determination concerning parental rights and child custody unless the determination is not supported by sufficient evidence to meet the clear and convincing standard of proof." Id. (Citation omitted.)
 {¶ 35} R.C. 2151.414(D) requires the trial court in determining the best interest of a child to consider all relevant factors, including:
 {¶ 36} "(1) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
 {¶ 37} "(2) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
 {¶ 38} "(3) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999;
 {¶ 39} "(4) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;
 {¶ 40} "(5) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child."
 {¶ 41} The trial court's findings in this case, which are supported by competent, credible evidence in the record, provide in relevant part as follows:
 {¶ 42} "The Court determines that an order of permanent custody to MCCS is not in the best interests of said child due to the psychological issues and special needs of the child. Further, there are no relatives who are willing to assume custody of the children and the foster parents do not wish to adopt, nor is there any other prospective adopting family.
 {¶ 43} "Further, this case is similar to In re Tanker,142 Ohio App.3d 159, 8th District, April 2, 2001, where the Court found that denying permanent custody and allowing PPLA was in the children's best interest where the children had special needs that the foster parents could care for and there was evidence enough to show that the children are unable to function in a family-like setting and must remain in residential care. Here, Luke has special needs that need to be dealt with on a consistent basis that a normal family would not no (sic) how to deal with upon adoption. This would put said child into the category of being unable to function in a family-like setting and needing to remain in residential care similar to the children in In reTanker. The progress that Luke has made does not mean that he can be placed in any home, and he needs this same level of care and trust that is being provided to him in this family-like home.
 {¶ 44} "The Decision to deny permanent custody is in the best interests of the child due to the circumstances present here. The child has been diagnosed with reactive attachment disorder, ADHD, post-traumatic stress disorder, and possibly is bi-polar. (Tr. 118) All of these disorders must be dealt with carefully, and the foster parents have special training in dealing with Attachment Disorder. (Tr. 132-133) Further, said child had to learn how to be a family, which was aided by the care from the foster parents and through the bonding process treatment with them. (Tr. 135) Said child has settled down in school and has become determined to work more in therapy to give him better survival skills. (Tr. 141) The foster parents, the Provosts, have played an important role in Luke's positive changes in his behavior. (Tr. 145) There is a bond between Luke and the Provosts. (Tr 171) This evidence proves that the family is an important asset and a source of support and stability in Luke's life.
 {¶ 45} "His therapist, Ms. Nemeth has stated that it is important for Luke to be able to trust and not see the world as a dangerous place. (Tr 156) If he were placed for adoption, which would result in a change in caregivers, schools, home, and possibly his counselor, Luke will likely have feelings of rejection and abandonment. (Tr. 157-158) Going from home to home makes Attachment Disorder worse because there is never any place that the child feels safe. (Tr 151) Thus, if Luke is taken out of his current home where he has been guaranteed security that he can live there until he is at least 18 years old, then his sense of stability and trust is lost, and he will need to begin learning to trust all over again. Luke is happy where he currently is, and this is actually the first situation that he has been happy in. (Tr. 170-171)
 {¶ 46} "If Permanent Custody were granted to MCCS, there is no assurance that this child will be adopted in a reasonable amount of time. This child has numerous problems with feeling rejected by everyone and attaching to new people, so any change in his circumstances would be detrimental to his well-being. Additionally, the Guardian Ad Litem recommended that Luke remain in the foster care of the Provosts and requested that permanent custody be denied in this case. If removed from the PPLA, he loses his sense of stability, which has been a factor in his improvements thus far. For these reasons, the Decision of the Magistrate is AFFIRMED."
 {¶ 47} The trial court's findings clearly demonstrate that the court considered the statutory factors in R.C. 2151.414(D)(1) and (2), and that those factors favor keeping Luke in a PPLA in his current foster home rather than awarding permanent custody to MCCS. The State points out that Ms. Nemeth testified that despite being bonded to his current foster family, Luke was not significantly attached to them and could cope with being removed under the right circumstances. She also testified, however, about the disadvantages associated with removing Luke from his current foster home, including a loss of security, stability and trust. In determining the credibility of the witnesses and the weight to be given to their testimony, the trial court as trier of facts was free to reject Nemeth's suggestion that the benefits of removing Luke from his foster home in favor of adoption might, under appropriate circumstances, outweigh the detrimental effects.
 {¶ 48} The State argues that Luke's custodial history with MCCS favors a grant of permanent custody to the agency, per R.C.2151.414(D)(3), because Luke has been in the agency's custody since 1997, and in a PPLA since January 2000. Such provisions and the limitations placed upon the court's authority to place a child in long term foster care (PPLA) by R.C. 2151.353(A)(5) are designed to insure that a child does not languish, forgotten, in custodial limbo for long periods of time without permanency: what has been called "foster care drift." Those concerns are adequately addressed, however, by the fact that MCCS may continue to seek a modification of the child's disposition by way of a motion which must be heard and considered "as if it were the original disposition hearing." R.C. 2151.353(E)(2).
 {¶ 49} The State additionally argues that the trial court's refusal to qualify Ms. Nemeth as an expert witness prevented her from presenting evidence that Luke needs a legally secure placement that cannot be achieved unless he is adopted, which would require a grant of permanent custody to the agency, a factor the court must consider in determining the best interest of the child. R.C. 2151.414(D)(4). We disagree with this assertion. As we discussed in connection with the previous assignment of error, during her testimony on cross and redirect examination Nemeth did express her view that for therapy reasons Luke would be better off in an adoptive home rather than remaining in a PPLA with his current foster family. Based upon the totality of the evidence presented, including Nemeth's other testimony, the trial court obviously disagreed with Nemeth's view of the best placement for Luke, and rejected it, which the court was entitled to do.
 {¶ 50} Having carefully reviewed this record we conclude that there is clear and convincing evidence to support the trial court's determination that a PPLA is in Luke's best interest. Given the present circumstances, which are adequately set out in the trial court's findings, this case presents a situation where use of a PPLA is a common-sense way in which to satisfy Luke's best interest. In re Tanker (2001), 142 Ohio App.3d 159, 167. No abuse of discretion has been demonstrated.
 Family-Like Setting {¶ 51} One of the requirements for placing a child in a PPLA is that because of physical, mental, or psychological problems, or needs, the child is unable to function in a family-like setting. R.C. 2151.353(A)(5)(a). The State argues that this record fails to demonstrate that Luke is unable to function in a family-like setting. In support of that claim the State points out that Ms. Nemeth testified about the therapeutic progress Luke has made while living with his foster family. She also testified that Luke has learned to be in a family and has learned how to be part of a family as a result of being in foster care.
 {¶ 52} In addressing this exact same argument in a case with very similar facts, the court of appeals in In re Tanker,supra, stated:
 {¶ 53} "The court did not abuse its discretion in finding that the children qualified for a planned permanent living arrangement because there was competent, credible evidence to show that the children are unable to function in a family-like setting and must remain in residential care. The children have special needs that would likely make it impossible to place them in an ordinary adoptive household. The agency maintains that the children's residence in the foster home is `family-like,' thus showing that they can exist in a place other than residential or institutional care. But this argument misses the point — the foster parents are specifically trained to deal with the type of emotional and behavioral problems these children possess, so it cannot be said that the current foster home is akin to a true `family-like' setting. Hence, while it is certainly true that the foster parents have successfully established a `family,' it does not follow that their success suggests that these troubled children could live in any `home.' The court could rationally consider that these foster parents have established a family-like home for the children precisely because they have special skills that potential adoptive parents might lack." Id., at pp. 165-166.
 {¶ 54} Like the children in Tanker, Luke has a variety of very serious and debilitating mental and psychological problems and special needs which make his placement in an ordinary adoptive household unlikely, at best. Ms. Nemeth testified about these concerns and stated that Luke's basic and special needs are currently being met, and that he has a supportive, stable home environment with his current foster family, where he is making therapeutic progress precisely because his foster parents have special training in dealing with the type of mental, emotional and behavioral problems with which Luke is afflicted. It does not follow that because Luke is thriving and making progress in the family-like setting established by his current foster parents, he could function in any ordinary family-like home where the potential adoptive parents might lack the special skills possessed by Luke's current foster parents. The trial court did not abuse its discretion in determining that Luke could not function in a family-like setting due to his special psychological and behavioral problems and needs.
 Residential Care {¶ 55} Another requirement in R.C. 2151.353(A)(5)(a) for placing a child in a PPLA, is that because of those same problems the child must remain in "residential or institutional care." The State argues that Luke's current foster home does not meet the statutory definition of "residential care facility."
 {¶ 56} R.C. 2151.011(B)(43) defines residential care facility as any institution, residence or facility that is licensed by the department of mental health under R.C. 5119.22 and that provides care for a child. The record is unclear whether Luke's current foster home satisfies that definition of residential care facility. The only evidence presented at the September 26, 2002 hearing touching upon that issue was testimony by a caseworker for MCCS that Luke's foster home is a "contract home."
 {¶ 57} In any event, the State argues that Luke's current foster home does not meet the definition of residential care facility, because R.C. 5119.22(A)(1)(d) (iii) specifically excludes foster care facilities subject to R.C. 5103.03, and a facility providing care for a child in the custody of a public children services agency certified under R.C. 5103.03, from qualifying as residential facilities. We are not persuaded by this argument.
 {¶ 58} First, we note there is a distinction between "residential care facility" and "residential facility." See: R.C.2151.011(B) (43) and (44). The specific provision the State relies on in R.C. 5119.22(A)(1)(d) is concerned only with residential facilities and what does or does not constitute that, whereas R.C. 2151.353(A)(5)(a) is concerned with residential care.
 {¶ 59} There is a more fundamental flaw in the State's argument. R.C. 5119.22(A)(1) begins: "As used in this section:" That restrictive preamble limits the definitions which follow to that particular chapter of the Revised Code and what that section of the Revised Code is concerned with: the powers and duties of the Department of Mental Health to license residential facilities. Thus, the definition of residential facility employed by the General Assembly and "as used in" R.C.5119.22(A)(1)(d)(iii), does not extend to R.C. 2151.353(A)(5) and what that chapter of the Revised Code deals with, which is the juvenile court's disposition of abused, neglected and dependent children, and therefore does not eliminate foster homes from qualifying as "residential care" as that term is used in R.C.2151.353(A)(5)(a). Luke's circumstances do not fail to meet the requirements of R.C. 2151.353(A)(5)(a) and the trial court did not abuse its discretion in ordering that Luke be placed in a PPLA.
 {¶ 60} "Foster care drift" is an institutional failing that operates to the detriment of children who are left too long in foster care. The General Assembly has responded to that problem by enacting the foregoing sections of the Revised Code. However, in addition to setting standards, those sections seek to achieve the goal by imposing procedural requirements that are, too often, overly-rigid in reaction to the problems the juvenile courts must address and solve. Here, applying those requirements as MCCS would have us do would work to Luke's detriment, and no genuine benefit to the child is apparent. We understand that the agency, likewise, is following requirements the law imposes on it. The answer may be for the General Assembly to abandon such rigid legislative regimen in favor of clear standards which are flexible enough to avoid imposing bad results on children such as Luke.
 {¶ 61} This assignment of error is overruled. The judgment of the trial court will be affirmed.
Brogan, J. and Wolff, J., concur.